**Elmer GERTZ, Plaintiff-Appellee,**

v.

**ROBERT WELCH, INC.,
Defendant-Appellant.**

No. 81–2483.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 8, 1982.

Decided June 16, 1982.

Rehearing and Rehearing En Banc
Denied Sept. 15, 1982.

David Machanic, Pierson, Ball Dowd, Washington, D. C., for defendant-appellant.

Wayne Giampietro, DeJong, Poltrock & Giampietro, Chicago, Ill., for plaintiff-appellee.

Before SPRECHER and POSNER, Circuit Judges, and BONSAL,* Senior District Judge.

* Honorable Dudley B. Bonsal, Senior District Judge of the Southern District of New York, is sitting by designation.

Judge Sprecher's untimely death occurred between the preparation of his opinion for the court and the voting on that opinion by the other judges on the appeal.

**530**

SPRECHER, Circuit Judge.

This defamation action comes before us after retrial in the district court pursuant to the mandate of the Supreme Court in *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). A jury found in favor of the plaintiff, Elmer Gertz, and awarded compensatory and punitive damages. We affirm.

**I**

In June, 1968, seventeen-year-old Ronald Nelson was shot and killed by Chicago police officer Richard Nuccio. Nuccio was subsequently indicted and convicted of murder. In addition to the criminal prosecution, the Nelson family retained Chicago attorney Ralla Klepak to file civil actions against Nuccio on behalf of the family. Klepak asked Elmer Gertz, a well-known, reputable Chicago attorney, to serve as co-counsel in the civil actions. Neither Gertz nor Klepak played any role in the criminal prosecution against Nuccio beyond attending the coroner's inquest to ask a few questions on behalf of the family. Gertz made no public statements or comments concerning the civil or criminal cases against Nuccio.

In April, 1969, shortly after Nuccio's initial conviction,[1] an article appeared in *American Opinion* entitled "Frame-Up— Richard Nuccio and the War on Police." *American Opinion* is a monthly magazine published by defendant Robert Welch, Inc. ("Welch"), a Massachusetts corporation which is an affiliate of the John Birch Society. The article alleged that Nuccio was being "railroaded" as part of a Communist conspiracy to undermine local police so as to pave the way for a national police force which would support and enforce a Communist dictatorship.

The article named Gertz as one of the members of this conspiracy. He was identified as the lawyer for the Nelson family and one of the leaders of the "attack on Nuccio." Gertz was described as a "Com-munist-fronter," a "Leninist," and a "Marx-ist."

The file on Elmer Gertz in Chicago Police Intelligence takes a big, Irish cop to lift. According to the Communist *Worker* of December 8, 1964, he has signed a petition to abolish the House Committee on Un-American Activities. On May 12, 1966, he sponsored another such petition, published by the Illinois Division of the American Civil Liberties Union—founded by Harry F. Ward, one of the top Communists in the United States. Gertz also was a pallbearer for Jack Ruby, the "lone fanatic" who killed the "lone fanatic" who killed the President of the United States. He has been an official of the Marxist League for Industrial Democracy, originally known as the Intercollegiate Socialist Society, which has advocated the violent seizure of our government.

\* \* \* \* \* \*

In fact, the only thing Chicagoans need to know about Gertz is that he is one of the original officers, and has been Vice President, of the Communist National Lawyers Guild—which has been described by the House Committee on Un-American Activities as "one of the foremost legal bulwarks of the Communist Party"—and which probably did more than any other outfit to plan the Communist attack on the Chicago police during the 1968 Demo-crat Convention.

Gertz was also identified as counsel to the commission which authored *Dissent and Disorder,* a report on the April, 1968, demonstrations in Chicago which was critical of police conduct. The article described that report as "financed by the Roger Baldwin Foundation of Communist Harry Ward's A.C.L.U."

Gertz's role in the Nuccio case, according to the article, was as a leader of "an organized attempt to discredit our local police—organized primarily by the Communist Na-

---

1. Nuccio's initial conviction was reversed by the Illinois Supreme Court. *People v. Nuccio,* 43 Ill.2d 375, 253 N.E.2d 353 (1969). On retrial, Nuccio was again convicted in a jury trial, and that conviction was affirmed. *People v. Nuccio,* 54 Ill.2d 39, 294 N.E.2d 276 (1973).

tional Lawyers Guild, preeminent in which is the same Elmer Gertz who now appears as the Nelsons' lawyer." Under a photo of Gertz was the caption "Elmer Gertz of Red Guild harasses Nuccio." The article also noted that "[t]wo Chicago Assistant Corporation Counsels warned Nuccio not to testify at the coroner's inquest, for fear what he said might jeopardize their defense against Communist-fronter Gertz."

The assertion that Gertz was a Communist or part of a Communist conspiracy was false. Many of the other statements concerning his membership in particular organizations also were false. When Gertz learned of the article, he filed this diversity suit for defamation in the Northern District of Illinois. In a pre-trial ruling, the trial court held that the libelous words published by the defendant constituted libel *per se*. *Gertz v. Robert Welch, Inc.*, 306 F.Supp. 310 (N.D.Ill.1969). Because of this ruling, injury was presumed, and, upon proof of the falsity of the statements in the article, the court submitted only the issue of damages to the jury. The jury returned a verdict in favor of Gertz and awarded damages of $50,000. The trial court, however, granted judgment notwithstanding the verdict on the basis that the subject matter of the article was of "public interest" and therefore required a showing of actual malice under the standard announced in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Gertz v. Robert Welch, Inc.*, 322 F.Supp. 997 (N.D.Ill.1970). Because the court found that actual malice had not been established, the jury's verdict could not stand. On appeal, this court affirmed. *Gertz v. Robert Welch, Inc.*, 471 F.2d 801 (7th Cir. 1972).

The Supreme Court granted certiorari and reversed. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Court disavowed the "public interest" doctrine [2] as a basis for requiring that actual malice be shown in suits involving defamation of private individuals. The Court further held that states could set their own standards of liability for defamation of private individuals as long as they did not impose liability without fault. Damages could not be awarded without proof of injury, however, and punitive damages required a showing of actual malice. The case was remanded for a new trial consistent with these guidelines.

On remand, Gertz amended his complaint to allege both negligence and actual malice by Welch, and requested compensatory and punitive damages. On cross-motions for summary judgment, the trial court held that, based on the law of the case, Gertz was not a public figure, but otherwise denied the motions of both parties. Shortly before trial, Welch was permitted to file an affirmative defense of conditional privilege based on the assertion that the article merely repeated statements in government publications.

After a six-day trial, the jury found in favor of Gertz and awarded compensatory damages of $100,000 and punitive damages of $300,000. It is from this judgment that Welch appeals.

## II

Welch's initial argument is that the issue of actual malice was erroneously submitted to the jury in the second trial because the law of the case doctrine precluded the relitigation of that issue.[3] Welch bases this argument on the first trial court's finding, subsequently upheld by this court and the Supreme Court, that actual malice in publication of the article had not been proved. The issue of actual malice thus was fore-

---

**2.** Justice Brennan's plurality opinion in *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), had suggested that where an article deals with a matter of public interest it is protected by the First Amendment to the extent that any defamation is not the result of actual malice.

**3.** The law of the case argument was not made in any of the defendant's pleadings or pretrial motions. Ordinarily that would mean that the issue was waived and we would not address it on appeal. Because the law of the case doctrine as it applies to this case is not "merely advisory, but is binding upon the court on remand, we deem it necessary to examine this issue.

closed from being a basis for either liability or punitive damages. Welch would then read the Supreme Court's mandate remanding the case for a new trial as limited to the issues of whether liability existed and whether compensatory damages could be awarded predicated on a negligence theory. Because the trial court on remand determined that Welch was entitled to a conditional privilege which could only be overcome by a showing of actual malice, Welch argues that the trial court should have directed a verdict in its favor once the privilege was established.[4]

■ The law of the case doctrine "is a rule of practice, based on sound policy that, when an issue is once litigated and decided, that should be the end of the matter." *Barrett v. Baylor*, 457 F.2d 119, 123 (7th Cir. 1972) (citing *United States v. United States Smelting, Refining & Mining Co.*, 339 U.S. 186, 198, 70 S.Ct. 537, 544, 94 L.Ed. 750 (1950)). The doctrine is a self-imposed prudential limitation rather than a recognition of a limitation of the courts' power. 1B Moore's Federal Practice ¶ 0.404[10] at 573 (2d ed. 1980). It is not, therefore, an immutable rule, but rather a way to foreclose continued appeals for reconsideration of prior rulings of law. In this respect, the law of the case doctrine must be distinguished from *res judicata* : "[O]ne directs discretion; the other supersedes it and compels judgment." *Southern Railway Co. v. Clift*, 260 U.S. 316, 319, 43 S.Ct. 126, 127, 67 L.Ed. 283 (1922). *Accord, Connett v. City of Jerseyville*, 110 F.2d 1015, 1018 (7th Cir. 1940).

■ There are two distinct situations where the law of the case doctrine is applicable. First, a court ordinarily will not reconsider its own decision made at an earlier stage of the trial or on a prior appeal,

absent clear and convincing reasons to reexamine the prior ruling. *See, e.g., Appleton Electric Co. v. Graves Truck Line, Inc.*, 635 F.2d 603, 607–08 (7th Cir. 1980), *cert. denied*, 451 U.S. 976, 101 S.Ct. 2058, 68 L.Ed.2d 357 (1981). Second, an inferior court must apply the decision of a superior appellate tribunal on remand. *See, e.g., James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 572 F.2d 574, 577 (7th Cir. 1978).

It is the second situation which is before us in this case. Welch contends that the trial court failed to properly apply the Supreme Court's mandate, which, according to Welch, included the finding that, as a matter of law, the article was published without actual malice.[5]

■ The duty of the inferior courts to enforce the mandate of the Supreme Court is clear:

"When a case has been once decided by [the Supreme Court] on appeal, and remanded to the Circuit Court, whatever was before this court, and disposed of by its decree, is considered as finally settled. The Circuit Court is bound by the decree as the law of the case; and must carry it into execution, according to the mandate . . . ."

*Vendo v. Lektro-Vend Corp.*, 434 U.S. 425, 427–28, 98 S.Ct. 702, 703–704, 54 L.Ed.2d 659 (1978) (quoting *In re Sanford Fork & Tool Co.*, 160 U.S. 247, 255, 16 S.Ct. 291, 293, 40 L.Ed. 414 (1895)). *See also Ex parte Sibbald v. United States*, 37 U.S. (12 Pet.) 487, 491, 9 L.Ed. 1167 (1838). It is equally clear, however, that "[w]hile a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues." *Sprague v. Ticonic National Bank*, 307 U.S. 161, 168, 59 S.Ct. 777, 780–781, 83 L.Ed. 1184 (1939). *See also Banco*

---

4. Because the trial court on remand accepted Welch's argument that a conditional privilege applied here, *see* Part III, the case once again centered on actual malice. Thus, if Welch is correct about the law of the case issue, it would be dispositive of this case unless a distinction could be drawn between actual malice under *New York Times Co. v. Sullivan* and actual

malice sufficient to overcome a common law privilege. *See* footnote 13, *infra*.

5. Welch points to several places in the opinion where the Court suggests that actual malice was not proved at the first trial to support its position that the Court decided this issue. *See* 418 U.S. 329–30 n.2, 330–32, 94 S.Ct. 3001– 3002 n.2, 3003.

*Nacional de Cuba v. Farr*, 383 F.2d 166, 179 (2d Cir. 1967), *cert. denied*, 390 U.S. 956, 88 S.Ct. 1038, 20 L.Ed.2d 1151 (1968). Thus, it is critical to determine what issues were actually decided in order to define what is the "law" of the case. This requires a careful reading of the Court's opinion: observations, commentary, or mere dicta touching upon issues not formally before the Court do not constitute binding determinations. *See Quern v. Jordan*, 440 U.S. 332, 347 n.18, 99 S.Ct. 1139, 1148 n.18, 59 L.Ed.2d 358 (1979).

■ Applying these well-established principles to the case before us, we find no basis for the position that the issue of actual malice was determined and foreclosed from reconsideration by the Supreme Court's mandate. The primary issue in *Gertz* was "whether a newspaper or broadcaster that publishes defamatory falsehoods about an individual who is neither a public official nor a public figure may claim a constitutional privilege against liability for the injury inflicted by those statements." 418 U.S. 323, 332, 94 S.Ct. 2997, 3003, 41 L.Ed.2d 789 (1974). The Court answered this question in the negative. The Court also expressly rejected a constitutional privilege for defamatory statements contained in an article on a subject of "public interest." Rather, the Court held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability." *Id.* at 347, 94 S.Ct. at 3010. The Court further stated that the states could only permit compensation for actual injury, and that a showing of actual malice was required to support presumed injury or punitive damages. *Id.* at 349, 94 S.Ct. at 3011–3012. Finally, the Court ruled that Gertz was not a public figure. *Id.* at 352, 94 S.Ct. at 3013. The Court had no difficulty in agreeing with the trial court that Gertz's legal and community activities were not equivalent to "general fame or notoriety," nor had Gertz "thrust himself" into public view - in the

course of his involvement in the Nelson case so as to make him a public figure.

Thus, the law of the case in *Gertz*, as defined by the issues before the Court, consisted of the Court's guidelines on liability for defamation of private individuals by the media and the Court's further refinement of the public figure standard. Whether or not actual malice had been proved below simply was not an issue before the Court. The Court did not establish as a matter of law that actual malice had not and could not be proved. To the contrary, the Court's position on liability opened the door to a different standard for the second trial. The Court rejected the "public interest" theory which was the linchpin of the trial court's analysis and of this circuit's opinion.[6] Furthermore, by precluding the states from imposing strict liability, the Court radically changed the burden of proof in defamation cases. *See* 418 U.S. at 369–70, 94 S.Ct. at 3021–3022 (White, J., dissenting). This directly undercut the pretrial rulings below which, pursuant to existing Illinois law, had recognized the statements as libel *per se*, thereby presuming liability and injury. The change wrought by the guidelines adopted in *Gertz* thus totally undermined the legal framework of the first trial.

■ In recognition of this drastic shift from the standards which governed the first trial, the Court directed a new trial on all issues:

> Because the jury was allowed to impose liability without fault and was permitted to presume damages without proof of injury, a new trial is necessary. We reverse and remand for further proceedings in accord with this opinion.

418 U.S. at 352, 94 S.Ct. at 3013. The Court's mandate clearly includes retrial on all liability issues, including the question of actual malice. The trial court on remand did not misconstrue the Court's decision by

---

**6.** The Court thus limited *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), to its facts by refusing to

extend the "public interest" rationale enunciated in the plurality opinion to all cases involving private individuals.

permitting the parties to litigate the issue of actual malice.[7]

## III

■ Welch next contends that on remand Gertz failed to prove liability under either a negligence or an actual malice standard. This use of alternative arguments reflects the confusion present in the second trial concerning the correct standard of liability. Gertz's amended complaint alleged both negligence and actual malice as a basis for compensatory and punitive damages. When Welch raised the affirmative defense of reliance on public documents as a basis for the defamatory statements in the article, the trial court interpreted this defense as a claim of conditional or qualified privilege. Under Illinois law, a conditional privilege can only be overcome by proof of actual malice. The court noted the irony of its ruling:

> So, therefore, when I recognize the conditional privilege to exist in this case, it in effect eliminates the possibility of an award of compensatory damages without a showing of actual malice. That is our new standard. It's ironic in a sense we are back to an actual malice standard in

the case in light of the landmark ruling in *Gertz and Welch*.

In instructing the jury, the court defined the plaintiff's burden as requiring proof of negligence by a preponderance of the evidence *and* proof of actual malice by clear and convincing evidence.[8]

■ We note at the outset that the trial court imposed a more stringent liability standard than was required. Assuming that a conditional privilege was properly recognized in this case, its application was overbroad. Because the trial court required the jury to find *both* negligence *and* actual malice in order to impose liability in this case, however, the jury's verdict served to render this error in the application of the privilege inconsequential.[9] We deem it important, however, to establish the proper standard of liability in this case, and therefore turn to an examination of the court's application of the conditional privilege.

## A

The conditional privilege recognized by the trial court was a privilege for statements based on public documents.[10] The author of the *American Opinion* article, Alan Stang, testified that he had used

---

**7.** Welch also contends that no different evidence was offered at the second trial than at the first, and therefore no actual malice was proven. If this were so, the law of the case doctrine would dictate that the finding of insufficient evidence by the first trial court should apply here if the evidence is substantially the same. 5B C.J.S. *Appeal and Error* § 1964 (1958), 5 Am.Jur.2d, *Appeal and Error* § 748 (1962). That is not the case here, however. The second trial included testimony of several witnesses who did not testify at the first trial, most notably the author of the article, Alan Stang. Furthermore, the testimony of Scott Stanley, Welch's managing editor, and of Gertz himself was considerably more developed at the second trial. Thus the substantial similarity of evidence that would bring the issue within this aspect of the law of the case doctrine is not present.

**8.** The trial court instructed the jury as follows:
The plaintiff's claim consists of four essential elements:
First, that the defendant published a magazine article of and concerning the plaintiff which was libelous;

Second, that the defendant was negligent, as that term is explained in these instructions;
Third, that the libelous statements were read by persons other than the plaintiff, namely, members of the general public; and
Fourth, that the libelous statements were published with actual malice, as the term is explained in these instructions.

**9.** *See* text accompanying note 17 *infra*.

**10.** The trial court based its recognition of a conditional privilege on *Troman v. Wood*, 62 Ill.2d 184, 340 N.E.2d 292 (1975). In *Troman*, which followed the Supreme Court's decision in *Gertz*, the Illinois Supreme Court held that negligence would be the Illinois standard of liability for defamation of private individuals. 62 Ill.2d 198, 340 N.E.2d 292, 299. The court noted, however, that its holding was "not intended to remove any of the absolute or qualified privileges which have heretofore been recognized in this State to the extent that the facts may warrant their application." *Id.*

government reports as background material for the article and to check the results of his investigation. The managing editor, Scott Stanley, testified that he had "checked the checkables" before publishing the article, that is, he had checked statements against reference materials available to him, including some government reports.[11] On this basis, the trial court apparently found that all the defamatory statements made about Gertz were cloaked in a conditional privilege because of the sources used by the defendants.

Although the trial court did not explicitly identify the privilege which it applied, clearly the court was employing the privilege to report on public proceedings. This privilege permits the reporting of public proceedings in which defamatory statements have been made about private individuals. The privilege also covers republication of reports of an officially-constituted government committee. *Catalano v. Pechous*, 83 Ill.2d 146, 167–68, 50 Ill.Dec. 242, 252–253, 419 N.E.2d 350, 360–61 (1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981); *Lulay v. Peoria Jour-*

*nal-Star, Inc.*, 34 Ill.2d 112, 115, 214 N.E.2d 746, 748 (1966). The defamatory statements made in the course of these proceedings are privileged as long as the republication is "accurate and complete or a fair abridgement of such proceedings." *Lulay v. Peoria Journal-Star, Inc.*, 34 Ill.2d 112, 115, 214 N.E.2d 746, 748 (1966). *See Nagib v. News-Sun*, 64 Ill.App.3d 752, 755, 21 Ill. Dec. 567, 570, 381 N.E.2d 1014, 1017 (1978); *Coursey v. Greater Niles Township Publishing Corp.*, 40 Ill.2d 257, 261–62, 239 N.E.2d 837, 839 (1968); Restatement (Second) of Torts § 611 (1977).[12] The privilege may be overcome, however, by a showing that the publication was motivated by actual malice. *Zeinfeld v. Hayes Freight Lines, Inc.*, 41 Ill.2d 345, 350, 243 N.E.2d 217, 221 (1968). Thus, a publisher is liable if he "knew at the time when the statement was published that it was false, or acted in reckless disregard of its truth or falsity." *Catalano v. Pechous*, 83 Ill.2d 146, 168, 50 Ill.Dec. 242, 253, 419 N.E.2d 350, 361 (1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).[13]

---

**11.** The only specific government reports referred to by Stang and Stanley were the "Guide to Subversive Organizations and Publications"; "Appendix IX", which was identified as reports of the House Select Committee on Un-American Activities under the chairmanship of Representative Dies, published in 1944; and a file document, "National Lawyers' Guild—Foremost Legal Bulwark of the Communist Party", which was identified as a congressional report published in 1951.

**12.** The interest served by the privilege is the public's right to know and be informed of public proceedings. W. Prosser, Handbook of the Law of Torts 830 (4th ed. 1971). *See Greenbelt Coop. Publishing Ass'n v. Bresler*, 398 U.S. 6, 11, 90 S.Ct. 1537, 1540, 26 L.Ed.2d 6 (1970). Thus, the privilege protects communication which is at the heart of First Amendment concern. *Lulay v. Peoria Journal-Star, Inc.*, 34 Ill.2d 112, 114, 214 N.E.2d 746, 748 (1966); *Watson v. Southwest Messenger Press, Inc.*, 12 Ill.App.3d 968, 972, 299 N.E.2d 409, 412 (1973). The privilege, however, is narrowly confined to reports which are complete and accurate or a fair abridgement of the proceedings. *Id. See* Restatement (Second) of Torts § 611, Comment f (1977). This reflects the nature of the underlying interest. It also reflects a judgment that the speaker or republisher of the defamatory statement has an obligation to publish a

fair and complete report, inasmuch as a defamatory statement may be contradicted or mitigated by the totality of the circumstances in which it was uttered.

This interest in public information should be distinguished from the interest in unfettered communication which supports an absolute privilege for the speaker of defamatory statements made in the course of a governmental proceeding. *See* W. Prosser, Handbook of the Law of Torts 781–82 (4th ed. 1971); Restatement (Second) of Torts §§ 588, 590 (1977). The privilege also must be distinguished from the defense of fair comment on matters of public concern, which is sometimes referred to as a privilege. This covers commentary and opinion, but not assertions of fact. *See* W. Prosser, Handbook of the Law of Torts 792, 819–20 (4th ed. 1971). The Restatement (Second) of Torts considers fair comment to be "opinion," and therefore not actionable, so that a privilege is unnecessary. Restatement (Second) of Torts §§ 606–610 (1977).

**13.** *Catalano v. Pechous*, 83 Ill.2d 146, 50 Ill. Dec. 242, 419 N.E.2d 350 (1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981), appears to have adopted the *New York Times* definition of actual malice as the actual malice necessary to overcome a conditional privilege. *See New York Times Co. v. Sullivan*,

The case before us differs considerably from those cases in which the privilege has previously been applied. Those cases have generally involved a newspaper or magazine which, relatively contemporaneous with the public proceeding, published an account of the proceeding in an article focusing on the proceeding. *See e.g., Coursey v. Greater Niles Township Publishing Corp.,* 40 Ill.2d 257, 239 N.E.2d 837 (1968); *Nagib v. News-Sun,* 64 Ill.App.3d 752, 21 Ill.Dec. 567, 381 N.E.2d 1014 (1978); *Segall v. Lindsay-Schaub Newspapers, Inc.,* 68 Ill.App.2d 209, 215 N.E.2d 295 (1966). Here, however, the article neither focused on the public proceedings which are claimed as the source of the privilege, nor was the article contemporaneous with those proceedings. The proceedings were reports of congressional committees published in the 1940's and 1950's. The activities of those committees were not the subject of the article, but rather the committees' reports were cited in, or used as a basis for, particular sentences. The Illinois decisions do not indicate whether the privilege should apply when public proceedings are reported on in this manner. *See Catalano v. Pechous,* 83 Ill.2d 146, 168, 50 Ill.Dec. 242, 252–253, 419 N.E.2d 350, 360–61 (1980), *cert. denied,* 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981) (refusal to rule whether length of time before republication, and other factors, would affect privilege). *Cf. Coursey v. Greater Niles Township Publishing Corp.,* 40 Ill.2d 257, 262, 239 N.E.2d 837, 839–40 (1968) (strict application of privilege when

failure to report dismissal of one charge against policeman directly affected defamatory statement). Although the applicability of the privilege to these defamatory statements is far from certain in this case, we assume, without deciding, that the privilege could be applied under these circumstances.

Even assuming the privilege was properly invoked in this case, we find that the district court's application of the privilege was overbroad. First, the court appeared to extend the privilege for *reporting on* government proceedings to cover articles *relying on* reports of government proceedings. We have found no Illinois case to support such an interpretation of the privilege. Where a publisher merely reports a statement, states it fairly, and does not modify or misstate the statement, the privilege is applicable, provided there is no actual malice. Where, on the other hand, a statement in the record of a public proceeding is merely part of one's research, and is used to support an assertion not made in the public document, the privilege does not apply. Rather, in the latter situation, whether there is liability for the republication of the statement should be judged by the reasonableness of reliance upon the public document. *See Troman v. Wood,* 62 Ill.2d 184, 198, 340 N.E.2d 292, 299 (1975).

At trial, Stang claimed that he checked "government reports" to determine the nature of the organizations and activities listed in Gertz's police intelligence file.[14] The

376 U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). This obviates the possible difference between common law malice and the constitutional standard which could require a confusing differentiation in the standard of proof and liability depending on which type of "malice" is at issue. *See, e.g., Cantrell v. Forest City Publishing Co.,* 419 U.S. 245, 251–52, 95 S.Ct. 465, 469–470, 42 L.Ed.2d 419 (1974); Restatement (Second) of Torts § 592A, Special Note on Conditional Privileges and the Constitutional Requirement of Fault (1977). This would also suggest that the standard of proof for actual malice to support punitive damages would be harmonious with the *New York Times* standard. *See Newell v. Field Enterprises,* 91 Ill.App.3d 735, 756, 47 Ill.Dec. 429, 446, 415 N.E.2d 434, 451 (1980); *Fopay v. Noveroske,* 31 Ill.App.3d 182, 197, 334 N.E.2d 79, 92

(1975). *Cf. Tunnell v. Edwardsville Intelligencer, Inc.,* 43 Ill.2d 239, 252 N.E.2d 538 (1969), *cert. denied,* 397 U.S. 1021, 90 S.Ct. 1259, 25 L.Ed.2d 530 (1970) (no distinction made between liability standard of actual malice for public official and punitive damages standard of actual malice).

14. Stang identified nine articles which he used as background material for the article, none of which were government documents and none of which were used as sources for his specific statements about Gertz. Four of the articles were reprints from the Congressional Record of articles placed in the record by various Congressmen. None of these articles, however, were in the nature of verbatim transcripts of speeches; rather, they were articles published in other publications. One article was au-

reports he named in his testimony were "Appendix IX," "Guide to Subversive Organizations," and "National Lawyers' Guild—Foremost Legal Bulwark of the Communist Party."[15] The only statement made about Gertz in any of those documents was that he had been a member of the National Lawyers' Guild from the 1930's to 1950. Other than that "fact," which Stang may not have reported accurately,[16] there were no other statements about Gertz in these government reports. Thus, Stang *relied* on those reports to characterize as Communist the organizations which he claimed that Gertz belonged to, which claim was, in turn, based on Stang's *reliance* on material from the police intelligence file. The same three documents identified by Stang were the only documents used by Stanley when he "checked the checkables." Again, only Gertz's past membership in the National Lawyers' Guild could be verified in those documents. Otherwise, Stanley testified, he relied on Stang. Thus, government documents were primarily relied upon, not reported on, for this article.

Second, any application of the privilege should have been limited to those statements about Gertz that were actually checked against these documents. Instead, the trial court applied the privilege to the entire article. This might have been appropriate had the focus of the article, or even a substantial section of the article, been upon

the congressional committee proceedings which were the basis of the public reports. Application of the privilege to the entire article was not appropriate here, however, where the reports were used only to verify certain statements.

Thus, only those statements which were fair and accurate republications of statements made in the government documents were covered by the privilege. These statements had to be published with actual malice in order to be the basis of liability. The remaining defamatory statements in the article, however, could be the basis of liability if they were published as a result of negligence.

The jury below, however, was required to find that negligence *and* actual malice were proved in order to find liability. This higher burden of proof than was actually required in no way undermines the jury's verdict. If the standard of actual malice was satisfied, then by definition an intentional breach of duty occurred, thus more than satisfying the negligence standard where that was applicable.[17]

### B

The *New York Times* actual malice standard is deceptively simple: knowing falsity or reckless disregard of the truth or falsity of the defamatory statement. *New York Times Co. v. Sullivan*, 376

---

**15.** *See* note 11, *supra.*

**16.** Stang made no effort to determine if Gertz was still a member of the Guild nor did he limit the statement in the article to 1950.

**17.** The negligence standard for defamation of a private individual was summarized by the Illinois Supreme Court as follows:

> [R]ecovery may be had upon proof that the publication was false, and that the defendant either knew it to be false, or, believing it to be true, lacked reasonable grounds for that belief . . . . [N]egligence may form the basis of liability regardless of whether or not the publication in question related to a matter of public or general interest.

*Troman v. Wood*, 62 Ill.2d 184, 198, 340 N.E.2d 292, 299 (1975). This standard clearly would be subsumed in a finding of actual malice.

thored by Senator Byrd but there was no indication in the record that article was published pursuant to any official proceedings. Republication in the Congressional Record does not make any of these articles privileged. *See* Restatement (Second) of Torts § 611, Comment d (1977); 50 Am.Jur.2d, *Libel and Slander* § 221.

Stang testified that most of his information about Gertz came from a "big Irish cop," who was not identified at trial, who provided him with notes culled from Gertz's Chicago Police Department intelligence file. A secret police file hardly qualifies as a report on a public proceeding. Nor does the repetition of this information by a public official, a police officer, make this a report of a public proceeding. *See* W. Prosser, Handbook of the Law of Torts 831 (4th ed. 1971); 53 C.J.S. *Libel and Slander* § 129 at 210 (1948). *See also* 50 Am.Jur.2d *Libel and Slander* § 264 (1970).

U.S. 254, 280, 84 S.Ct. 710, 726, 11 L.Ed.2d 686 (1964). *See also Garrison v. Louisiana*, 379 U.S. 64, 79, 85 S.Ct. 209, 218, 13 L.Ed.2d 125 (1964). Recklessness means that the publisher "in fact entertained serious doubts as to the truth of his publication," *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968), or had a "subjective awareness of probable falsity." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 335 n.6, 94 S.Ct. 2997, 3005 n.6, 41 L.Ed.2d 789 (1974). This standard makes it "essential to proving liability that the plaintiff focus on the conduct and state of mind of the defendant." *Herbert v. Lando*, 441 U.S. 153, 160, 99 S.Ct. 1635, 1640, 60 L.Ed.2d 115 (1979). Although a publisher does not have an absolute duty to investigate, *St. Amant v. Thompson*, 390 U.S. 727, 733, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968), a publisher cannot feign ignorance or profess good faith when there are clear indications present which bring into question the truth or falsity of defamatory statements. A publisher cannot

> automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, . . . when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation. Likewise, recklessness may be found *where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports.*

*St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (footnote omitted) (emphasis added). *See also Curtis Publishing Co. v. Butts*, 388 U.S. 130, 169–70, 87 S.Ct. 1975, 1998–1999, 18 L.Ed.2d 1094 (1967) (Warren, C. J., concurring); *Carson v. Allied News Co.*, 529 F.2d 206, 211 (7th Cir. 1976); *Grzelak v. Calumet Publishing Co.*, 543 F.2d 579, 582 (7th Cir. 1975); *Fadell v. Minneapolis Star & Tribune Co.*, 425 F.Supp. 1075, 1084–85 (N.D.Ind.1976), *aff'd*, 557 F.2d 107 (7th Cir.), *cert. denied*, 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 452 (1977).

The evidence in this case clearly established that the publisher had "obvious reasons to doubt the veracity . . . or accuracy" of the author of the defamatory statements, and conducted only the most perfunctory investigation of the truth or falsity of the statements in the article. Stang was not unknown to Stanley; to the contrary, he had written articles for various John Birch Society publications since 1963, was a contributing editor to the Society's magazine, and had written two books published by the Society. Some of these prior writings had been edited by Stanley and Stanley was aware of the general content of all of them. Invariably, Stang had labeled someone a Communist in these writings. Among the diverse persons and organizations identified as Marxist, Communist, or under Communist control were Richard Nixon, John Foster Dulles, U Thant, Hubert Humphrey, Pierre Trudeau, Dr. Martin Luther King, and the Democratic Party.

Furthermore, Stanley solicited the article. The article was Stanley's idea, not Stang's. Stanley had contacted Stang and told him that a Chicago policeman was being railroaded for murder, part of the nationwide Communist conspiracy to discredit police. Stanley asked Stang to go to Chicago to investigate and write an article about this. Stanley also provided Stang with background materials for the article.

Stanley submitted the article for typesetting only three to four hours after it was received. The usual editing time of several weeks or more was shortcut because Stanley wanted the article in the April issue of *American Opinion*, and the internal preparation printer's deadline fell on the day after the article came in. The time was foreshortened, therefore, not because this was "hot news" but rather because of editorial preference and prior planning. In those three to four hours, Stanley edited the article and "checked the checkables"—the latter being his only effort to verify the statements made in the article. This check verified only that Gertz had been a member

of the National Lawyers' Guild from the 1930's to 1950, and that the Lawyers' Guild was identified as a Communist-front organization by a report of the House Committee on Un-American Activities. Stanley made no effort to update this information, nor to examine any other available sources of information about Gertz. Instead, he obtained a photograph of Gertz from the *Chicago Tribune* and captioned it "Elmer Gertz of Red Guild harasses Nuccio." He also wrote the title of the article, a note on the author, and a comment on the inside front cover of the April issue urging readers to examine Stang's story.[18]

In summary, Stanley conceived of a story line; solicited Stang, a writer with a known and unreasonable propensity to label persons or organizations as Communist, to write the article; and after the article was submitted, made virtually no effort to check the validity of statements that were defamatory *per se* of Gertz, and in fact added further defamatory material based on Stang's "facts." There was more than enough evidence for the jury to conclude that this article was published with utter disregard for the truth or falsity of the statements contained in the article about Gertz.[19] "Freedom of the press under the First Amendment does not include absolute license to destroy lives or careers." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 170, 87 S.Ct. 1975, 1999, 18 L.Ed.2d 1094 (1967) (Warren, C. J., concurring).

The evidence, therefore, supports the jury's finding of actual malice. To the extent that the conditional privilege for reports of government proceedings attaches to this case, it was overcome by a showing of abuse of the privilege. The evidence of actual malice subsumes a breach of duty which satisfies the negligence standard ap-

---

**18.** Stanley's endorsement read, in part:

[W]e do know that when *American Opinion's* Alan Stang goes after the facts in a story he gets them—just as he has, again, in the very important article beginning on page one.

Mr. Stang reports this month on the framing for murder of an outstanding Chicago police officer—a man with no less than twenty-six formal citations for the excellence of his police work. That this is a part of the Communist war on our police is as certain as the innocence of the officer they have chosen as their symbolic target. So important is this one, in fact, that reprints will be made immediately available.

**19.** Furthermore, Stang's conduct in investigating and researching the article also is evidence of actual malice. Stang's conduct is attributable to Welch because of the agency relationship between them. Stang was solicited to write this specific article, was given the story line and background material, was reimbursed for his expenses, and kept in contact with Stanley during the preparation of the article. These facts, particularly the significant control exercised by Stanley over the content and focus of the article, are sufficient to establish an agency relationship. *See City of Evanston v. Piotrowicz*, 20 Ill.2d 512, 518–19, 170 N.E.2d 569, 573 (1960); *Johnston v. Suckow*, 55 Ill.App.3d 277, 280, 12 Ill.Dec. 846, 849, 370 N.E.2d 650, 653 (1977); *Reith v. Gen. Tel. Co.*, 22 Ill.App.3d 337, 339, 317 N.E.2d 369, 372 (1974). The implications of that relationship are that the acts of the agent are attributable to the principal. *Gomien v. Wear-Ever Aluminum, Inc.*, 50 Ill.2d 19, 21, 276 N.E.2d 336, 338 (1971); *Wind-*

*sor Lake, Inc. v. WROK*, 94 Ill.App.2d 403, 410, 236 N.E.2d 913, 917 (1968).

Stang's research for this article was akin to the "slipshod and sketchy investigatory techniques" condemned in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 169–70, 87 S.Ct. 1975, 1998–1999, 18 L.Ed.2d 1094 (1967) (Warren, C. J., concurring). Stang visited Chicago twice to research the article. None of the persons he interviewed told him that Gertz had been involved in the criminal prosecution of Nuccio. He did not interview any of the lawyers involved in the criminal or civil actions against Nuccio. He read the transcript of Nuccio's criminal trial and looked at the pleadings filed in the civil case, which had the names of Gertz and Ralla Klepak on them. He also talked to an unnamed Chicago police officer who gave him notes taken from Gertz's police intelligence file. Stang admitted at trial, however, that he had no knowledge of the source of the information in the files or whether the information was accurate. Stang also testified that he consulted government documents about the organizations listed in Gertz's police intelligence file. This was not an exhaustive search of government records, but rather a selective use of particular reports of certain congressional committees published twenty to thirty years earlier. The only facts verified in these reports were Gertz's membership in the National Lawyers' Guild to 1950, and that the Guild had been identified as a Communist-front organization. Stang made no effort to find out if Gertz was still a member of the Guild, nor did he attempt to contact or interview Gertz.

plicable to the bulk of the defamatory statements made in the article. Finally, the finding of actual malice provided the necessary predicate for the award of punitive damages.

## IV

■ The remaining issues raised by Welch relate to damages. First, Welch argues that the jury instructions on actual malice and punitive damages tainted the jury's award of compensatory damages.[20] Welch speculates that because the jury had to find actual malice in order to award either compensatory or punitive damages, the jury was unable to separate its determinations and awarded excessive compensatory damages based on its distaste for the publisher's conduct. The jury instructions, however, clearly separated compensatory and punitive damages, and there is no indication in the record that the jury had any difficulty following those instructions. Nor is the implication that the compensatory damages award was excessive borne out by the record. "The determination of an adequate verdict is peculiarly within the province of the jury and great weight must be given to its determination." *Ball v. Continental Southern Lines, Inc.*, 45 Ill.App.3d 827, 831, 4 Ill.Dec. 334, 337, 360 N.E.2d 81, 84 (1977). We find no basis here to disturb the jury's verdict.

■ Second, Welch argues the award of compensatory damages was improper because there was no proof of actual injury. The short answer to this contention is that because there was evidence of actual malice in the publication of the defamatory statements, which were libel *per se*, Illinois law would permit, and the Constitution would not prohibit, presumed damages. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349, 94 S.Ct. 2997, 3011, 3012, 41 L.Ed.2d 789 (1974); *Carson v. Allied News Co.*, 529 F.2d 206, 214 (7th Cir. 1976); *Newell v. Field Enterprises, Inc.*, 91 Ill.App.3d 735, 741–42, 47 Ill.Dec. 429, 436, 415 N.E.2d 434, 441 (1980).

■ Nonetheless, Gertz has proved actual injury in this case. Gertz testified to the severe mental distress, anxiety and embarrassment which he suffered as a result of the article. Several attorneys testified at trial that calling a lawyer a Communist would be highly injurious to professional reputation. One witness, Albert Jenner, testified that he had heard the defamatory statements about Gertz repeated.

The Supreme Court has recognized that actual injury in defamation cases is not solely measured by out-of-pocket economic loss. "Indeed, the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974). This kind of actual injury was clearly established by the evidence presented at trial.

Therefore, because we find no merit in the issues raised on appeal, the judgment of the trial court is

AFFIRMED.

---

20. As part of this argument, Welch also contends that the issue of actual malice should never have gone to the jury. We repeat our conclusion that the evidence was sufficient to submit the issue of actual malice to the jury. *See* Part III, *supra*.