UNITED STATES of America, Plaintiff,

**Carolyn Burauer, Intervening Plaintiff–Appellant,**

and

**Barbara McNamara, Intervening Plaintiff, Cross–Appellee,**

v.

**CITY OF CHICAGO, et al., Defendants–Appellees, Cross–Appellants.**

Nos. 87–1973 & 87–2076.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 12, 1988.

Decided Aug. 3, 1988.

As Amended Aug. 9, 1988.

---

Richard Gutman, Richard Gutman, P.C., Chicago, Ill., for intervening plaintiff-appellant.

Linda E. Fisher, Northwestern University School of Law, Chicago, Ill., for intervening plaintiff, cross-appellee.

Peggy A. Davis, Corp. Counsel, Chicago, Ill., for defendants-appellees, cross-appellants.

Before WOOD, Jr., EASTERBROOK and KANNE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

These appeals arose from a consolidated action, initiated in 1973, challenging the hiring and promotion practices within the Chicago Police Department. The City of Chicago was found to have discriminated on the basis of sex and race in hiring and promotion, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17. The present appeals concern the individual petitions of two intervening plaintiffs for back pay.

## I. FACTUAL BACKGROUND

At the time of the discriminatory acts, the Chicago Police Department had three distinct job positions: "patrolman," "policewoman," and "police matron." Only pa-

trolmen did police patrol work. Women were not permitted to become patrolmen. Policewomen and police matrons were principally assigned to duties involving the processing and custody of female prisoners and certain duties in the Youth Division. All policewomen and police matrons were women.

On December 4, 1971, the City of Chicago gave an entrance examination for the position of patrolman. Intervening plaintiffs Carolyn Burauer and Barbara McNamara contend that they would have applied for the patrolman position in 1971 had the job been open to them. Women, however, were not allowed to take the examination.

Burauer and McNamara instead took the policewoman/police matron examination that was given on June 3, 1972. This test was only open to women. Of the 1,395 women who passed the test, McNamara ranked 322 and Burauer ranked 1,115.

Title VII became applicable to municipalities in March 1972. The City, however, continued to hire from the rosters of the 1971 and 1972 exams. Although the City hired approximately 1,400 police officers between March 1972 and May 1975, only ninety-eight of those hired were women. On November 7, 1974, the district court issued a preliminary injunction prohibiting the City from using the 1971 roster in hiring patrol officers. Nevertheless, the court indicated that the City could apply for permission to use the 1971 roster pending the development of a non-discriminatory entrance examination. 385 F.Supp. 543, 562 (N.D.Ill.1974). On February 2, 1976, the district court issued a permanent injunction ordering the City to hire women for positions in the Chicago Police Department "in accordance with the same standards and procedures and on an equal basis with men." 411 F.Supp. 218, 248–49 (N.D. Ill.1976). Although the City had given a unisex patrol officer examination in April 1975, its results were still not available when the district court entered its memorandum decision on January 5, 1976. The court, frustrated at the "delay in the new method of selecting patrol officers," *id.* at 224, ordered that the existing 1971 and 1972 rosters be used to fill the current and future patrol officer vacancies, with sixteen percent of the new hirees being female, until further order of the court. *Id.* at 241–42, 249. On September 7, 1976, the district court approved the roster compiled by the City from the results of the 1975 unisex patrol officer exam. 420 F.Supp. 733, 736 (N.D.Ill.1976).

McNamara was hired on March 8, 1976 from the 1972 roster. Burauer took the 1975 unisex patrol officer exam and was ultimately hired from the resulting roster on January 28, 1980. Both women filed petitions seeking back pay from April 3, 1972, the first hiring date after Title VII became applicable to municipalities, to the dates that they were actually hired.

On March 30, 1987, the district court, in an oral decision issued from the bench, denied relief to Burauer. The court, using the 1972 roster on which Burauer was ranked 1,115 and the actual hiring history of the Chicago Police Department during 1972–1974, determined that Burauer would not have been hired during that period even if the City had not discriminated. Thus, the court ruled that Burauer was not an actual victim of the City's discriminatory hiring practices and was therefore not entitled to back pay. In the same decision, the court awarded McNamara $36,666.24 in back pay from March 19, 1973, the date that McNamara would have been hired if the City had not discriminated, to March 8, 1976, the date she was actually hired. The court also awarded her retroactive seniority, attorney's fees, and $67,758.80 in prejudgment interest.

Both Burauer and the City filed motions for reconsideration, which the court denied. Burauer now appeals the district court's denial of her claim for benefits. In its cross-appeal, the City only challenges the inclusion of $5,260 in McNamara's total back pay award, and the portion of the prejudgment interest produced by the $5,260. The City contends that McNamara should have mitigated her damages to that extent. We have jurisdiction over both these appeals under 28 U.S.C. § 1291.

## II. DISCUSSION

In awarding damages in a Title VII case, a court must determine whether the claimant was an actual victim of the employer's discriminatory practices. *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 371–72, 97 S.Ct. 1843, 1873, 52 L.Ed.2d 396 (1977). After identifying the actual victims, the court must do its best to recreate the conditions and relationships that would have existed if the unlawful discrimination had not occurred. *Id.* at 372, 97 S.Ct. at 1873; *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 769, 96 S.Ct. 1251, 1266, 47 L.Ed.2d 444 (1976). The Supreme Court has held that, "given a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975) (footnote omitted). Thus, the Court has held that a finding that an employer engaged in employment discrimination in violation of Title VII triggers a rebuttable presumption that the claimant is entitled to an award of back pay and retroactive seniority. *Teamsters*, 431 U.S. at 359 & n. 45, 97 S.Ct. at 1867 & n. 45; *Franks*, 424 U.S. at 772, 96 S.Ct. at 1268. To defeat a Title VII plaintiff's claim for damages, the employer must prove that the plaintiff was not an actual victim of discrimination. *Teamsters*, 431 U.S. at 362, 369 n. 53, 97 S.Ct. at 1868, 1872 n. 53; *Franks*, 424 U.S. at 772–73, 96 S.Ct. at 1268; *Caviale v. State of Wis., Dep't of Health & Social Servs.*, 744 F.2d 1289, 1296 (7th Cir.1984). The employer must provide clear and convincing evidence to meet its burden. *Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1559 (11th Cir.), *cert. denied*, 479 U.S. 883, 107 S.Ct. 274, 93 L.Ed.2d 250 (1986); *Stewart v. General Motors Corp.*, 542 F.2d 445, 453 (7th Cir.1976), *cert. denied*, 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977). As an affirmative defense, the employer may prove that the plaintiff failed to mitigate damages. *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1234 (7th Cir.1986); *Hanna v. American Motors Corp.*, 724 F.2d 1300, 1307 (7th Cir.), *cert. denied*, 467 U.S. 1241, 104 S.Ct. 3512, 82 L.Ed.2d 821 (1984).

### A. *Burauer's Appeal*

Burauer contends that the district court erred in using the 1972 policewoman roster to determine whether she would have been hired if the City had not discriminated. Burauer claims that the 1971 patrolman examination would be a more appropriate guide. In the alternative, Burauer argues that her results on the 1975 unisex exam are a better measure than her ranking on the 1972 policewoman roster.

The parties agree that the actual victims in this case are those women who, but for the City's discriminatory practices, would have taken the 1971 patrolman exam and been hired between March 1972, when Title VII became applicable to municipalities, and December 16, 1974, when the court approved an interim hiring agreement. The district court, adopting the City's approach, looked to the 1972 policewoman roster to determine those women who would have been most likely to have taken the 1971 patrolman exam if it had been open to women. The court then analyzed the actual hiring of women by the Chicago Police Department during the relevant period. During that period, ninety-eight women were hired from the 1972 roster, in rank order, for policewoman positions. The ninety-eighth woman hired was ranked 182 on the 1972 roster, indicating that roughly half the women on the roster were both qualified and willing to accept a police job when it was offered. Therefore, the court assumed that if more women had been hired during this period, they would have been hired from the 1972 roster in rank order and the rank order of the last woman hired would have been approximately double the total number of women hired. The court then determined that, absent discrimination, twenty-three percent of the patrolmen hired during the · relevant period should have been female. Using this percentage, the court found that those women

who ranked 634 or better on the 1972 roster were actual victims of discrimination. Because Burauer ranked 1,115, she would have been too far down on the list to have been hired between 1972 and 1974. Therefore, the court concluded that she would have had to take the 1975 unisex patrol officer exam in any event, and thus is not an actual victim of discrimination.

The district court believed that the law of the case required it to use the 1972 policewoman roster in determining whether Burauer would have been hired absent discrimination. Courts apply the law of the case doctrine in two distinct situations. "First, a court ordinarily will not reconsider its own decision made at an earlier stage of the trial or on a prior appeal, absent clear and convincing reasons to reexamine the prior ruling. Second, an inferior court must apply the decision of a superior appellate tribunal on remand." *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 532 (7th Cir. 1982) (citations omitted), *cert. denied*, 459 U.S. 1226, 103 S.Ct. 1233, 75 L.Ed.2d 467 (1983).

Both situations were present in this case. In its oral decision rendered from the bench on March 30, 1987, the court explained that, in determining whether Burauer and McNamara were actual victims of discrimination, the court would apply the law of the case, using the 1972 roster in the same fashion as it had in the past to determine which women the City should hire. Thus, the court was adhering to the same approach it had used earlier in the litigation.

In addition, the district court believed that a decision of this court required it to use the 1972 roster. On February 2, 1976, the district court entered a final decree imposing mandatory hiring and promotion quotas to rectify the City's past discrimination. The decree permitted, but did not require, the use of existing eligibility lists in hiring and promotion. 411 F.Supp. at 249. On appeal, this court found that Illinois law required the use of eligibility lists in the hiring and promotion of police officers. 549 F.2d 415, 425–26 (7th Cir.1977). Thus, we reversed the district court's order to the extent that it did not affirmatively

require that police officers be hired and promoted in rank order from eligibility lists compiled pursuant to Illinois law. *Id.* at 437–38. The district court read our opinion as requiring it to use the 1971 and 1972 rosters, rather than some other standard, for determining whether Burauer and McNamara would have been hired by the City.

Burauer contends that the district court misread our earlier opinion. This court, in 1977, held that "the City must utilize the results of *some* examination given pursuant to Illinois law in appointing patrol officers." *Id.* at 438 (emphasis added). Thus, Burauer argues that the district court could have used only the 1971 patrolman roster, without considering the 1972 policewoman roster. Burauer believed that the City should have been required to prove that she would not have scored well enough on the 1971 patrolman examination to have been hired between 1972 and 1974 absent discrimination. The language of our 1977 decision might encompass Burauer's approach. Nevertheless, the district court's approach was equally consistent with our requirement of using the results of state-authorized examinations. In addition, the law of the case doctrine not only requires district courts to follow the mandates of appellate tribunals, but also to adhere to their own decisions made at an earlier stage of the litigation. *Gertz*, 680 F.2d at 532. The district court explicitly explained that it was using the results of the 1972 policewoman examination to simulate nondiscriminatory hiring practices, just as it had earlier in this litigation. Thus, the district court was following its own law of the case.

Burauer contests the district court's use of the 1972 policewoman roster because the positions of "patrolman" and "policewoman" were fundamentally different jobs. Policewomen did not do patrol work. Therefore, the policewoman exam presumedly did not test applicants for skills related to patrol work, although the record does not reveal the specifics of the policewoman test. Thus, Burauer argues that the 1971 patrolman exam is the relevant

test to determine who the City would have hired as patrol officers between 1972 and 1974 if it had not discriminated. *See Franks*, 424 U.S. at 773 n. 32, 96 S.Ct. at 1268 n. 32 (to determine whether an applicant would have been hired for a particular position, court must look to the actual requirements for the job at that time). Burauer contends that her score on the 1972 policewoman exam is no indication of how she would have scored on the patrolman exam had the City allowed her to take it.

■ We agree with Burauer that the 1972 policewoman exam is not a perfect indication of how she would have scored on a nondiscriminatory patrol officer test. As the Supreme Court has recognized, however, a court's reconstruction of a discrimination-free job market can never be precise. *See Teamsters*, 431 U.S. at 372, 97 S.Ct. at 1873. The district court found that using the 1972 roster was an appropriate means of determining which women would have taken the 1971 patrolman exam if it had been open to them. The 1971 patrolman exam and the 1972 policewoman exam were given only six months apart. While the 1972 exam might not have tested the women on patrol officer skills, it did provide some evidence of how the women would perform relative to one another. Thus, the district court's use of the rankings from the 1972 policewoman exam to determine which women would have been hired as patrol officers absent discrimination was not an abuse of discretion. *See Albemarle Paper*, 422 U.S. at 424, 95 S.Ct. at 2375 (indicating that courts should apply abuse of discretion standard).

■ Burauer argues that the City could have provided better evidence of how she would have performed on the 1971 exam by actually administering the exam to her. In the alternative, Burauer argues that the court should have looked to her actual results on the 1975 unisex patrol officer exam. Burauer relies on *Rodriguez v. Taylor*, 569 F.2d 1231 (3d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978), in which the court awarded a Title VII claimant back pay because the employer failed to administer the appropriate exam to the claimant and thus did not meet its burden of proving that the claimant would not have been hired even if the employer had not discriminated. In *Rodriguez*, however, the employer did not present any other reliable means of determining whether the claimant would have been hired. *Id.* at 1240. Here, as the district court found, the 1972 roster provided rankings of women likely to have taken the 1971 examination. Because the 1972 exam was the only police examination open to women at that time, and because the 1971 and 1972 exams were given only six months apart, we cannot say that the district court's finding was clearly erroneous. *See Andre v. Bendix Corp.*, 774 F.2d 786, 793 (7th Cir.1985). Thus, the City's approach of using the 1972 roster and the actual hiring experience during the relevant period was sufficient to meet its burden of proof.[1]

The district court found that it was constrained by the law of the case doctrine to follow the approach it did. This court has held that "[t]he law of the case doctrine is not to be lightly disregarded." *Shakman v. Dunne*, 829 F.2d 1387, 1393 (7th Cir. 1987), *cert. denied*, ―― U.S. ――, 108 S.Ct. 1026, 98 L.Ed.2d 991 (1988). Even if the law of the case did not constrain the district court, we believe that its approach was not an abuse of discretion. In requiring courts to recreate the conditions that

1. Burauer relies on *Franks*, which suggested that district courts must use "nondiscriminatory standards *actually applied*" by the employer. 424 U.S. at 773 n. 32, 96 S.Ct. at 1268 n. 32 (emphasis in original). Unfortunately, no such standards were available to the district court in this case. The 1971 and 1972 exams were both discriminatory standards. *See* 549 F.2d at 428–35. Furthermore, the 1975 exam, while a nondiscriminatory standard, was not "actually applied" during 1972–1974. In addition, although the results are not available to us in the record, we note that while Burauer took and passed the 1975 exam, it took her five years to be hired off that roster. Thus, we are not convinced that Burauer's ranking on the 1975 roster was significantly better than that on the 1972 roster. In any event, because there was no actual nondiscriminatory standard used between 1972 and 1974, we cannot say that the district court abused its discretion.

would have existed without discrimination in order to award damages, the Supreme Court recognized that the "process of recreating the past [would] necessarily involve a degree of approximation and imprecision." *Teamsters*, 431 U.S. at 372, 97 S.Ct. at 1873. Keeping in mind the imprecision inherent in the district court's task of trying to determine what would have occurred if the City had not discriminated, we do not believe that the district court " 'abused' its traditional discretion to locate 'a just result' in light of the circumstances peculiar to [this] case." *Albemarle Paper*, 422 U.S. at 424, 95 S.Ct. at 2375. Therefore, we affirm the district court's denial of Burauer's claim for individualized relief.

### B. *City of Chicago's Cross–Appeal*

█ The City challenges the district court's award of back pay to McNamara on the grounds that McNamara failed to mitigate her damages. We must uphold the district court's award of damages unless it was clearly erroneous. *Wheeler v. Snyder Buick, Inc.*, 794 F.2d 1228, 1234 (7th Cir. 1986).

To aid us in reviewing the City's cross-appeal, we will briefly outline McNamara's employment history. McNamara wished to become a police officer. While employed by Purolator Securities, McNamara took the 1972 policewoman exam. As we previously noted, McNamara ranked 322 on that exam. The following year, McNamara left Purolator Securities and accepted a civil service position with the City of Chicago Purchasing Department. The City job paid substantially less than her salary at Purolator Securities. In addition, McNamara testified that she did not feel sufficiently challenged by the purchasing job. McNamara took a leave of absence from the Purchasing Department in March 1974, after working there for four months. Dur-

ing the next fourteen months, McNamara allegedly sought work as a police officer, although the record does not reveal the extent of her efforts. In May 1975, McNamara was hired by the Cook County Police and Corrections Merit Board to screen Cook County police and jail guard applicants. McNamara continued at that job until the City hired her on March 8, 1976 as a patrol officer with the Chicago Police Department.

To prevail on its affirmative defense that the plaintiff failed to mitigate damages, the City must prove "both that the [plaintiff] was not reasonably diligent in seeking other employment, and that with the exercise of reasonable diligence there was a reasonable chance the [plaintiff] might have found comparable employment." *Wheeler*, 794 F.2d at 1234. The City claims that McNamara failed to exercise reasonable diligence when she left her job with the City of Chicago Purchasing Department and was unemployed for fourteen months.

The district court found that McNamara was reasonably diligent in leaving her job with the Purchasing Department to search for a position as a police officer. Because of her high score on the 1972 policewoman exam, the court found that McNamara had a reasonable expectation of employment by the Chicago Police Department. After the City illegally excluded McNamara from the position of patrol officer, a position for which she was qualified, McNamara was not required to accept or maintain inferior employment. The Supreme Court, in discussing the statutory duty of Title VII claimants to minimize their damages,[2] noted that an unemployed claimant need not accept a lesser or dissimilar position. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 & n. 14, 102 S.Ct. 3057, 3065 & n. 14, 73 L.Ed.2d 721 (1982).[3] Nor is a claimant required to

---

2. "Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g).

3. The Supreme Court noted that "[s]ome lower courts have indicated ... that after an extended period of time searching for work without suc-

cess, a claimant must consider taking a lower-paying position." *Ford Motor*, 458 U.S. at 232 n. 16, 102 S.Ct. at 3066 n. 16. Nevertheless, we have approved cases in which the claimants' employment history was similar to McNamara's. *See Hunter v. Allis–Chalmers Corp., Engine Div.*, 797 F.2d 1417, 1428 (7th Cir.1986) (court would permit three years, but not five years, of unsuccessful employment search);

continue in an inferior position that she has already accepted. *See Wheeler,* 794 F.2d at 1234–35 ("We agree with the district court that the duty to mitigate damages does not preclude a plaintiff from quitting a position in a different business that pays substantially less money."); *Hanna v. American Motors Corp.,* 724 F.2d 1300, 1309 (7th Cir.), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3512, 82 L.Ed.2d 821 (1984). McNamara's job with the Purchasing Department was not a position equivalent to that of police officer. McNamara was justified in leaving the Purchasing Department to search for a job substantially equivalent to that of police officer.[4]

To support its argument, the City relies on *Brady v. Thurston Motor Lines, Inc.,* 753 F.2d 1269 (4th Cir.1985). *Brady* recognized the long-standing principle that a plaintiff who voluntarily quits comparable interim employment fails to exercise reasonable diligence. *Id.* at 1277. This rule, however, is not unqualified. As the *Brady* court explained, "a voluntary quit does not toll the [back pay] period when it is prompted by unreasonable working conditions or the earnest search for better paying employment." *Id.* at 1278. Thus, we agree with the district court that McNamara acted with reasonable diligence when she left a low-paying position[5] that was not providing her with enough work to occupy her time. The City has not shown that McNamara's decision to search for a higher-paying, more challenging job was "motivated by personal reasons unrelated to the job." *Id.* In addition, we note that the *Brady* rule applies only to *comparable* interim employment. *Id.* at 1277. Therefore, the district court was not clearly erroneous in ruling that McNamara was entitled to back pay during the fourteen months that she was unemployed after leaving the Purchasing Department.[6]

## III. CONCLUSION

The district court did not abuse its discretion in using the 1972 policewoman roster to determine whether Burauer would have been hired during the relevant period if the City had not discriminated against her. Applying that approach, the district court was not clearly erroneous in denying Burauer's claim for individualized damages. Likewise, the district court was not clearly erroneous in finding that McNamara was not required to mitigate her damages by continuing in a dissimilar and lower-paying job. Accordingly, the district court's ruling, in all respects, is

AFFIRMED.

---

*Hanna v. American Motors Corp.,* 724 F.2d 1300, 1306–10 (7th Cir.) (four and one-half years of unemployment except for temporary jobs), *cert. denied,* 467 U.S. 1241, 104 S.Ct. 3512, 82 L.Ed.2d 821 (1984); *Orzel v. City of Wauwatosa Fire Dep't,* 697 F.2d 743, 756–57 (7th Cir.) (one part-time job, one application for full-time employment, and placement of name with job service during a two-year period), *cert. denied,* 464 U.S. 992, 104 S.Ct. 484, 78 L.Ed.2d 680 (1983); *Sprogis v. United Air Lines, Inc.,* 517 F.2d 387, 392–93 (7th Cir.1975) (one two-month position and one application during a two-year period).

**4.** Contrary to the City's arguments, the equivalent employment test applies regardless of whether the employee was wrongfully discharged or never hired in the first place. *See, e.g., Stone v. D.A. & S. Oil Well Servicing, Inc.,* 624 F.2d 142 (10th Cir.1980).

**5.** McNamara earned approximately $9,200 each year that she worked at Purolator Securities. In contrast, McNamara's salary while working for the Purchasing Department was approximately $4,500 per year. McNamara almost doubled her earnings when she accepted the position with Cook County, which paid approximately $8,400.

**6.** Our finding as to McNamara's reasonable diligence might be different if she did not actively and continually seek comparable employment during her fourteen months of unemployment. The record, however, does not indicate the extent of McNamara's efforts to obtain employment as a police officer during this period. Therefore, the City has not met its burden of showing a lack of reasonable diligence. *See Sprogis,* 517 F.2d at 392–93.