**Georgia M. CAVIALE,
Plaintiff-Appellant,**

v.

**STATE OF WISCONSIN, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Defendant-Appellee.**

No. 83–2439.

United States Court of Appeals,
Seventh Circuit.

Argued May 31, 1984.
Decided Sept. 26, 1984.

Jeff Scott Olson, Julian & Olson, Madison, Wis., for plaintiff-appellant.

John R. Sweeney, Wis. Dept. of Justice, Madison, Wis., for defendant-appellee.

Before PELL and CUDAHY, Circuit Judges, and CAMPBELL, Senior District Judge.[*]

PELL, Circuit Judge.

Plaintiff-appellant, Georgia Caviale, brought suit pursuant to Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. §§ 2000 *et seq.*, alleging that her employer, the State of Wisconsin, Department of Health and Social Services, discriminated against her on the basis of sex when it denied her a promotion to the position of Milwaukee Regional Director, Division of Community Services. Plaintiff tried the case to the district court, without a jury, and argued that defendant's selection of candidates to fill the post of regional director from an exclusive and circumscribed pool had a disparate and discriminatory impact on women. The District Judge, John Shabaz, ruled that plaintiff had failed to establish a prima facie case of sex discrimination and that, even if plaintiff had established such a case, defendant met its burden of proving that its selection method was a business necessity. On appeal, Caviale claims that the district court erred when it ruled she had not established a prima facie case and when it found defendant had sustained its burden on the issue of business necessity.

## I. Facts

Plaintiff-appellant, Georgia Caviale, is the holder of university degrees in Speech, Sociology, and Social Work, some of which she earned with honors. Caviale also has to her credit numerous professional and community service credentials. She began her professional career as a supervisor in the Milwaukee County Department of Public Welfare. During the 1950s and early 1960s, she worked as a probation officer in DuPage County, Illinois, advancing to the level of Chief Probation Officer, a position whose responsibilities included management of a county-wide department that offered social service programs. In 1962,

Caviale returned to Wisconsin and served as Deputy Director of Social Services in Waukesha County. She advanced to the level of full Director, a position that required Caviale to supervise five case worker directors and fifty case workers. In 1966, she moved from county-level administration to the state's Department of Health and Social Services.

The departments of Wisconsin's state government, including the defendant, Department of Health and Social Services (the Department), are organized into divisions, each headed by an Administrator. Some of the divisions are in turn divided into geographical districts with a District Administrator at its fore. In 1977, the Division of Mental Hygiene, which monitored the distribution of state funds to municipal and state mental health institutions, contained seven geographical districts. In 1968, Georgia Caviale was appointed to the post of District Administrator for the Milwaukee District, a district that was composed of Milwaukee County and the six counties around it. Caviale received a salary designated Pay Range 17, one range above the salary the other District Administrators in the Division of Mental Hygiene received. The salary difference reflected the greater responsibilities borne by the Milwaukee Regional Office. The Division of Family Services was also divided into districts, and the Milwaukee District of that division coincided geographically with the Milwaukee District of the Division of Mental Hygiene. In 1977, the Milwaukee District Administrator of the Division of Family Services was Charles Holton.

In 1977, the Department consolidated the Divisions of Mental Hygiene, Family Services, and Aging into a new Division of Community Services. Under the consolidation plan, the old seven-county Milwaukee District was to be divided into a new Milwaukee Region consisting solely of Milwaukee County and a new Southeast Region containing the remaining six counties. The

[*] William J. Campbell, Senior District Judge of the Northern District of Illinois, sitting by desig-

nation.

Regional Director in charge of the Milwaukee Region would receive a salary at Pay Range 19 and the Regional Director in charge of the other regions would receive pay at Range 18.

This case arose out of the Department's decision to limit application eligibility for the new Milwaukee Regional Director position to its then-current members of the Career Executive Program, all of whom were men. The Wisconsin legislature created the Career Executive Program in 1972 to promote excellence in the state's administration. Only those who receive a salary at Pay Range 18 or above may be members of the Program. When the Program was implemented in 1974, an employee receiving a salary at Pay Range 18 could opt to become a member. Prior to 1976, a non-career executive who wished to apply for a position salaried at Pay Range 18 or above had to pass a battery of tests administered by the Executive Assessment Center, an institution created for this purpose. A non-career executive could also submit to assessment at the Center without applying for any particular position in anticipation of using his score later. In 1975, Caviale submitted to tests at the Center under the latter plan and scored poorly.

In 1976, the Center was closed and non-career executives submitted to ordinary civil service screening and testing procedures when applying for jobs salaried at Pay Range 18 or above. Thus, in 1977 when the Department underwent reorganization, there were three distinct groups of people in the Career Executive pool. First, there were those who in 1974 had occupied positions salaried at Pay Range 18 or above. Second, there were those who had successfully competed for Career Executive jobs from 1974 through 1976, when the Executive Assessment Center played a major role in the screening process. Third and finally, there were those who had successfully competed after 1976 for such jobs under ordinary civil service selection methods. All told, there were thirty-three career executives in the Department in 1977. In all departments of state service, there were approximately 200 career executives.

None of the thirty-three career executives in the Department was a woman, and only two or three of the 200 state-wide career executives were women.

On June 17, 1977, Caviale telephoned Dr. Leonard Ganser, the Administrator of the Division of Mental Hygiene, to express her interest in becoming the new Regional Director of the Milwaukee Region. Dr. Ganser replied that, where there was a career executive currently in the District Administrator position for a district, he expected to fill the Regional Director post with current career executives from the Department's pool. Since Charles Holton was a career executive in the position of District Administrator, Division of Family Services, he or a different career executive would obtain the post in which Caviale had expressed interest. Sometime prior to July 27, 1977, Holton obtained a position in the Department's Central Office in Madison, and he consequently withdrew his application for Milwaukee Regional Director. On July 27, Ganser wrote to Gerald Berge, a career executive in the Department who was also under consideration for the position of Milwaukee Regional Director. Ganser stated that he had reconsidered his decision to restrict application for the Regional Director's position and that he would now recommend opening competition for the post to all qualified state employees. Ganser, however, encouraged Berge to reapply when the position was announced on the broader basis. On August 1, 1977, Caviale learned that Holton was no longer in contention for the post she sought, and she once again telephoned Ganser. Ganser, contradicting his writing to Berge, stated that the position would be filled from the pool of career executives in the Department. On August 9, 1977, Ganser wrote to Berge, stating that the Department had now decided not to offer the Milwaukee Regional Director position on a broad basis and that the Department had selected Berge to fill the post.

On August 12, 1982, Caviale, having exhausted her administrative remedies, filed suit in federal district court against the

Department, alleging employment discrimination on the basis of sex in violation of Title VII of the Civil Rights Act of 1964. The case was tried to the bench on the theory that the Department's restricting applications for the position of Milwaukee Regional Director to current career executives had a disparate and discriminatory impact on women. Caviale presented evidence that several alternatively defined pools of qualified potential applicants for the position of Milwaukee Regional Director all contained substantial numbers of women. For example, Caviale showed that one potential group of applicants, namely defendant's full-time "Officials and Administrators," a classification used by the United States Equal Employment Opportunity Commission, contained 10 percent women as of July 1977. Caviale also showed that 20.8 percent of the defendant's employees at Pay Range 15 and above were women. The percentage of women in these comparison pools, Caviale contended, established that the selection of candidates from a pool that contained no women had a prohibited disparate impact on women.

On June 22, 1983, Judge Shabaz issued a decision in favor of defendant and ordered the cause dismissed. Judge Shabaz agreed that the case should be analyzed under the disparate impact model, but he disagreed with Caviale's assertion that the statistics proved unlawful discrimination. Judge Shabaz reasoned that the post of Milwaukee Regional Director required a high level of managerial capability. Therefore, in order for Caviale to prevail, she had to show that the challenged, facially neutral employment criterion, namely membership in the Career Executive Program, imposed a substantially disproportionate burden upon females who possess the managerial qualifications demanded by the post. General statistics concerning the percentage of women in the administrative posts of state service, the court further opined, would not suffice to show a disproportionate burden because women in such a comparison pool would not necessarily possess the subjective qualities that the Department would desire when filling the post of Regional

Director. Judge Shabaz further concluded that, even if Caviale had established a prima facie case of disparate impact, the Department sustained its burden to prove that the challenged criterion was a business necessity. Finally, Judge Shabaz stated that, had Caviale established defendant's liability for sex discrimination, she would not have been entitled to damages because Berge, the actual selectee, was more qualified for the position than was Caviale. Caviale filed a timely appeal from the district court's final decision.

## II. Discussion

In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), black employees at respondent's North Carolina generating plant brought an action under Title VII challenging respondent's requirement of a high school diploma or a passing grade on an intelligence test as a condition of employment and transfer within the plant. The district court had made an unchallenged finding that no discriminatory purpose underlay the adoption of the diploma and test requirements. The Supreme Court reversed the appellate court ruling which was that absent discriminatory purpose, use of the requirements was lawful under Title VII. The Court stated, "The objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees." *Id.* at 429–30, 91 S.Ct. at 853. The Court continued, "The Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity. If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance, the practice is prohibited." *Id.* at 431, 91 S.Ct. at 853. On the record before the Court, it was plain that the respondent's practices were discriminatory in operation. In 1960, only 12 percent of black males had completed high school in North Carolina,

whereas 34 percent of white males had done so. Likewise, in sample administrations of the intelligence test in question, only 6 percent of the black candidates passed the test as opposed to 58 percent of the whites. The Court further concluded, on the basis of the record, that "neither the high school completion requirement nor the general intelligence test is shown to bear a demonstrable relationship to successful performance on the jobs for which it was used." *Id.* at 431, 91 S.Ct. at 853.

In *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977), the Supreme Court further clarified the respective burdens of proof borne by the parties in a discrimination suit based upon the disparate impact model:

> [T]o establish a prima facie case of discrimination, the plaintiff need only show that the facially neutral standards in question select applicants for hire in a significantly discriminatory pattern. Once it is thus shown that the employment standards are discriminatory in effect, the employer must meet "the burden of showing that any given requirement [has] ... a manifest relationship to the employment in question." ... If the employer proves that the challenged requirements are job related, the plaintiff may then show that other selection devices without a similar discriminatory effect would also "serve the employer's legitimate interest in 'efficient and trustworthy workmanship'."

*Id.* at 329, 97 S.Ct. at 2726–2727 (citations omitted).

Since Caviale agreed that no discriminatory purpose underlay the decision of the Department to limit application for the post of Regional Director to current career executives, she argued to the district court that the Department's decision, although facially neutral as to sex, in effect fell more harshly on women than it did on men and hence constituted a violation of Title VII under the *Griggs* and *Dothard* cases. The district court held that Caviale had not established a prima facie case, but we find

that holding untenable in light of the district court's own explicit factual findings.

■ In order to establish a prima facie case, Caviale first had to show that she was qualified for the position of Regional Director. In his memorandum opinion, Judge Shabaz made a factual finding that "[P]laintiff was qualified for the position of Milwaukee Regional Director." The Department does not challenge this finding on appeal. Next, Caviale had to show that she was a member of a group protected under Title VII, and Caviale's satisfaction of this requirement is also not disputed. Finally, Caviale had to show that the Department's challenged selection criterion imposed a disproportionate burden upon women qualified for the position of Regional Director. One of the district court's factual findings reads in its entirety:

> The decision to limit applications for the Milwaukee position to current Career Executives affected outside interested and eligible persons, both male and female. The decision substantially limited the number of qualified females from the relevant pool who were available to apply, more than it limited the number of qualified males from the comparable pool.

The Department does not challenge this finding as clearly erroneous.

In light of this finding, it is difficult to understand how the district court could rule in favor of the Department on the issue of the prima facie case. The finding explicitly states that the challenged selection criterion "substantially limited" the number of otherwise "qualified women" available to apply more than it limited the number of qualified men. The finding necessarily means that Caviale satisfied the third and final requirement of a prima facie case. Judge Shabaz apparently believed that Caviale, in order to show disparate impact, had to produce a comparison pool of women who were not only objectively qualified for the position of Regional Director but who also possessed the subjective qualities the Department would likely seek when filling the post. Judge Shabaz

relied upon *Metrocare v. Washington Metropolitan Area Transit Authority*, 679 F.2d 922 (D.C.Cir.1982), for this proposition. Reliance on *Metrocare*, however, was misplaced. In *Metrocare*, black employees tried to show through statistical evidence that their employer engaged in a pattern or practice of discrimination. The evidence they introduced showed that the defendant's management stratum contained only 15 percent blacks whereas the percentage of blacks in all positions of the defendant's organization was 40 percent. The D.C. Circuit held for the defendant because the plaintiffs' comparison pool included secretarial and clerical workers, as well as managerial employees. There was no showing "that the persons now holding secretarial or clerical jobs are qualified for the managerial positions," and hence these statistics were insufficient to show class-wide discrimination. *Id.* at 930. Contrary to Judge Shabaz's belief, the court in *Metrocare* did not hold that members of a comparison pool must possess the subjective qualities desired by an employer. The members of a comparison pool need only possess "the *minimum objective qualifications* necessary for one to be eligible for promotion." *Davis v. Califano*, 613 F.2d 957, 964 (D.C. Cir.1979) (emphasis in original). *See DeMedina v. Reinhardt*, 686 F.2d 997, 1003 (D.C.Cir.1982); *Valentino v. United States Postal Service*, 674 F.2d 56, 71 n. 24 (D.C.Cir.1982). We agree with the D.C. Circuit's articulation of the standards for comparison pool evidence. The objective is to approximate the characteristics of those who are likely to apply and who meet the threshold requirements for a job. *See DeMedina, supra*, at 1007. A rule requiring members of the comparison pool to possess subjective qualities would render a plaintiff's burden of production nearly insurmountable. Subjective qualities that employers find desirable are rarely subject to quantitative proof. The court's finding, quoted above, states that the challenged selection criterion had a disproportionate impact on "qualified women." Because the term "qualified women" at the very least means "women with minimum objective qualifications," Caviale necessarily sustained her initial burden of proof.

■ The district court stated that even if Caviale had established her prima facie case, the Department sustained its burden on the issue of business necessity. On the basis of the record before us, we are compelled to reverse the district court and hold that the Department did not establish a business necessity. In *Griggs, supra*, the respondent power company argued that it could legitimately require its lowest ranking employees, members of the Labor Department, to have a high school diploma before they could transfer into the second lowest employment category, namely Coal Handler. The requirement, the respondents contended, was legitimate because it functioned to improve the overall quality of the workforce. The Supreme Court disagreed, reasoning that a challenged selection criterion had to "bear a demonstrable relationship to successful performance of the jobs for which it was used." *Id.* 401 U.S. at 431, 91 S.Ct. at 853. The Court required a reasonably tight fit between the challenged criterion and the actual demands of the job. The high school diploma requirement was invalid because it was too broad a selection criterion. The Court concluded its opinion by stating:

> Nothing in the Act precludes the use of testing or measuring procedures; obviously they are useful. What Congress has forbidden is giving these devices and mechanisms controlling force unless they are demonstrably a reasonable measure of job performance. Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins. Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant. What Congress has commanded is that any tests used must measure the person for the job and not the person in the abstract.

*Id.* at 436, 91 S.Ct. at 856.

We find the record in the case at bar bereft of evidence that membership in the

Career Executive Program was a job-related selection criterion. In fact, the principal evidence on record shows that Ganser considered membership a dispensable credential. Once Holton found a position in Madison, Ganser decided to eliminate membership in the Career Executive Program as a requirement for the position of Regional Director. Later, Ganser reinstated the Career Executive requirement, but he did so without explanation. The implication is that the Department's decision makers were themselves unconvinced that membership in the Career Executive Program was closely tied to job performance in the position of Regional Director.

Case Exhibits Nos. 605C and 2036, which are included in the record on appeal, contain descriptions of the position of Regional Director. The exhibits reveal that the Regional Director would be responsible for solving the problems likely to arise when three formerly independent divisions—the Division of Mental Hygiene, the Division of Family Services, and the Division of Aging—underwent consolidation. The documents also reveal that the Regional Director would be "responsible for monitoring, approving, and reviewing a total community budget that represents around 40 percent of the state total of over 60 million dollars." Had the Department shown each career executive to be experienced at organizing bureaucratic divisions or had the Department shown the career executives to be men versed in financial accounting, then the requisite fit between the challenged selection criterion and job performance might be evident. The record, however, fails to reveal a close match between the skills that the career executives possessed and the skills required in the position. The record leaves unidentified the skills of those men who became career executives in 1974 on the basis of their salary level.

With respect to those men who became career executives after 1976, the record fails to reveal the precise skills that recruiters sought using "ordinary civil service selection methods." Finally, the record shows that men who became career executives between 1974 and 1976 had achieved high scores on tests designed to measure qualities such as "tenacity," "sensitivity," "oral presentation," "responsiveness," and "problem analysis." We find these terms to sweep so broadly that they are barely helpful in identifying the distinguishing characteristics of career executives. It may very well be the case that the Department's career executives all had training in each of the divisions subject to consolidation and had experience reorganizing administrative agencies. For that matter, each career executive might have had extensive training in accounting. Similarly, it could well be that "tenacity" was just the quality the Regional Director needed to perform well at his job. The point is that the Department failed to produce evidence that would show any of these points to be true. The record is barren of evidence that would show a reasonable connection between membership in the Career Executive Program and good job performance. We accordingly must hold that the district court erred when it found that the Department met its burden to prove business necessity.

In sum, Caviale has established the Department's liability for discrimination in violation of Title VII. Caviale's statistics were, by the district court's own findings, sufficient to show a prima facie case of sex discrimination under the disparate impact model. Since Caviale established that the selection method was discriminatory in effect, the Department had the burden to prove that membership in the Career Executive Program was a job-related requirement. As we read the record, the Department failed to sustain its burden of proof. Consequently, liability has been established, and only the issue of proper relief remains for consideration.

The district court stated in its memorandum opinion that even had liability been established, Caviale could not have recovered damages. The district court reasoned that Berge was better qualified for the position and would have been appointed Regional Director even had Caviale been allowed to compete. We agree with the district court that Caviale should be denied damages if her qualifications relative to Berge's were such that she would not have

received the position even if applications for the post of Regional Director had been opened to a class including Caviale and Berge. *See Taylor v. Philips Industries, Inc.,* 593 F.2d 783, 787 (7th Cir.1979). Title VII was not intended to "guarantee a job to every person regardless of qualifications." *Griggs, supra,* 401 U.S. at 430, 91 S.Ct. at 853; *See Marotta v. Usery,* 629 F.2d 615, 617 (9th Cir.1980); *Rogers v. EEOC,* 551 F.2d 456 (D.C.Cir.1977). If Caviale recovers lost wages, the wages must be traceable to the Department's discriminatory acts and not to a legitimate, nondiscriminatory decision to hire one better qualified for the position.

■ We are unable to uphold the district court's determination, however, that Berge would have been appointed had the Department's selection system permitted competition between Caviale and Berge. The only evidence on the record concerning Berge's probable appointment is a single statement by Ganser on cross-examination to the effect that Berge's understanding of the Department objectives "was more comprehensive than [that of] other applicants." On redirect examination, Ganser admitted, however, that he did not know whether Berge would have even applied for the position had he been required to compete with non-career executives. We thus find the record incomplete on the important issue of the recoverability of damages. There is no way of telling on the basis of the trial record whether Caviale would have in fact competed against Berge had she been allowed to apply.

As we read the record, the parties focused the trial proceeding on the issue of liability and apparently contemplated further proceedings in the event liability was established. There is some tangential inquiry on the record regarding the recoverability of damages, but that inquiry is insufficient to establish the factual issues related to recovery. We accordingly remand the cause to the district court with instructions to conduct additional proceedings and determine the scope of Caviale's relief.

In the post-liability proceedings, the parties shall have a full opportunity to bring before the court evidence germane to the scope of Caviale's remedy. At this "remedial" stage of trial, the Department may defeat Caviale's damages claim if it shows that she would not have been appointed Regional Director even absent discrimination. The Department shall bear the burden of proving Caviale's inevitable rejection. This allocation is consistent with the principle placing upon a party the burden of proving facts peculiarly within its knowledge, *see Day v. Mathews,* 530 F.2d 1083, 1086 & n. 5 (D.C.Cir.1976), and with the principles announced in *Teamsters v. United States,* 431 U.S. 324, 357–62, 97 S.Ct. 1843, 1865–1868, 52 L.Ed.2d 396 (1977) (with respect to claimants who actually applied for jobs, employer may defeat claim of individual relief by sustaining burden of proving claimants would not have been hired even absent discrimination).

For the foregoing reasons, the district court's entry of judgment in favor of the Department is REVERSED, and the case is REMANDED pursuant to Circuit Rule 18 for further proceedings consistent with this opinion.