984 F.2d 1467
 60 Fair Empl.Prac.Cas. (BNA) 1210,
60 Empl. Prac. Dec. P 42,023
Ivan VON ZUCKERSTEIN, Dr. Devabhaktuni Ramaswami, Dr. Mohan
Jain, and Josip Vresk, Plaintiffs-Appellants,
v.
ARGONNE NATIONAL LABORATORY, Defendant-Appellee.
 No. 91-2490.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 23, 1992.
Decided Jan. 29, 1993.
Rehearing and Rehearing En Banc
Denied April 7, 1993.
 
 Mark L. LeFevour (argued), Callahan, Fitzpatrick, Lakoma & McGlynn, Oak Brook, IL, Charles Barnhill, Jr., Davis, Miner, Barnhill & Galland, Madison, WI, John L. Gubbins, Monfort, WI, for plaintiffs-appellants.
 R. Clay Bennett (argued), Michael J. Mueller, Donald J. McNeil, Laurie A. Spieler, Brian J. Fahey, Keck, Mahin & Cate, Chicago, IL, for defendant-appellee.
 Before CUMMINGS, FLAUM, and KANNE, Circuit Judges.
 FLAUM, Circuit Judge.
 
 
 1
 At the beginning of 1983, Dr. Devabhaktuni Ramaswami, Ivan Von Zuckerstein, Dr. Mohan Jain, and Josip Vresk were all employees of Argonne National Laboratory ("Argonne"). During 1983 and 1984, Argonne initiated lay offs due to reductions in funding. Von Zuckerstein was terminated at the end of 1983. In 1984 Vresk was transferred and reassigned. Jain and Ramaswami were terminated in 1985. Ramaswami, who is Indian by birth, Von Zuckerstein--German, Jain--also Indian, and Vresk--Croat, brought various section 1981 and Title VII claims, alleging that discrimination based on national origin and race motivated these employment decisions. After plaintiffs' argument, Argonne moved for a directed verdict on the section 1981 claims. The district court granted the directed verdict motion under Fed.R.Civ.P. 50 and dismissed the Title VII claims pursuant to Fed.R.Civ.P. 41(b).[1] We affirm.
 
 I.
 
 2
 Making sense of the various claims brought by the plaintiffs requires some background information. Argonne employs thousands of research scientists and engineers, and each scientist or engineer has responsibilities in two overlapping branches of Argonne's hierarchy--administrative and programmatic. Each scientist or engineer receives a position title that generally describes the functions performed by him or her (e.g., economist). Each job title has three gradations: assistant, full, and senior.
 
 
 3
 Each Argonne employee is assigned to a division; the divisions relevant to this case are Energy and Environmental Systems ("EES") and Engineering ("ENG"). Every division has a director, one or more associate directors, section heads and supervisors. Division supervisors compile evaluations of employees within their section. During the period at issue in this case, if the senior personnel of a scientist's or engineer's division believed that he or she merited a promotion, the division put together a case and submitted it to Argonne's Personnel Committee A. Among the factors considered in evaluating a request for a promotion are the acknowledged professional standing of the candidate, continued leadership in research, and a noteworthy record of publications.
 
 
 4
 In addition, each of the scientific and engineering projects at Argonne had its own reporting structure organized through programmatic positions. The person formally responsible to Argonne for the project is designated "principal investigator." A "project manager," who may or may not be the same person as the principal investigator, oversees the project. Furthermore, the principal investigator or project manager may be an assistant, full, or senior scientist or engineer. The project manager is responsible for evaluating all personnel working on the project. A written evaluation of the performance of each scientist or engineer is forwarded to that person's administrative supervisor, who in turn prepares summary evaluations. The effect is that a supervisor from one division may evaluate an employee from another division who is assigned to that supervisor's project.
 
 
 5
 Dr. Devabhaktuni Ramaswami began his career at Argonne in 1962 as a member of what is now Argonne's Engineering Division. Except for one brief lay off in 1973, Ramaswami continued to work without interruption until the reduction in force initiated in 1983. Completion of one aspect of a reactor upgrade project resulted in a decrease in demand for ENG Division personnel of Ramaswami's skill level, and he was scheduled to be laid off. Rather than being immediately laid off, he received a series of temporary assignments in the EES Division. Prior to his final assignment, Ramaswami elected to take an extended vacation. He was terminated in September, 1985. Although he subsequently applied for three positions after his termination, Ramaswami did not receive an offer of employment.
 
 
 6
 In 1976, Ivan Von Zuckerstein began working as an assistant economist in Argonne's EES Division. His functional job title was systems application economist. When the EES Division was forced to eliminate a number of staff positions because of funding cutbacks, Von Zuckerstein was terminated in June, 1983. He claims to have applied subsequently for more than fifty unspecified positions at Argonne, but other testimony confirmed only eight applications. He was not rehired.
 
 
 7
 Dr. Mohan Jain was hired as an assistant mechanical engineer in the EES Division in 1980. Jain's primary responsibilities were in Argonne's Industrial Cogeneration project, for which he served as a principal investigator. After being removed as principal investigator in 1983, he continued to work on the project until his termination in January, 1985. After his termination, Jain applied for a few unspecified positions at the lab but did not receive any job offers.
 
 
 8
 Josip Vresk began work with Argonne in 1975 as an engineering specialist in the ENG Division. In May, 1981, he was promoted from specialist to full mechanical engineer. In 1984, Vresk's section was relocated from the ENG Division to the Plant Systems Divisions to form the Plant Facilities and Services Division. As part of this reorganization, Vresk's section was divided into several sections, including a Project Management section and Engineering section. Vresk was assigned to the Engineering section. Vresk continues to work at Argonne.
 
 II.
 
 9
 Plaintiffs first contend that the district court denied them their Seventh Amendment right to a jury trial by impermissibly weighing evidence when it ruled on the Rule 50 directed verdict motion. Setting aside for the moment the question of weighing evidence, the prejudice to plaintiffs' Seventh Amendment right apparently lies in foreclosing the jury's opportunity to decide whether discrimination occurred by directing a verdict. While a directed verdict does inevitably preclude a decision by the jury, it certainly does not violate the Seventh Amendment by virtue of that fact alone. On the present facts, if the district court had directed a verdict on plaintiffs' section 1981 claims because it had dismissed their Title VII claims, its directed verdict would then rise to the level of a denial of the Seventh Amendment right to a jury trial. See, e.g., Hussein v. Oshkosh Motor Truck Co., 816 F.2d 348, 355-57 (7th Cir.1987). In this instance the district court did not decide plaintiffs' Title VII claims prior to their section 1981 claims. Thus, the only prejudice alleged here is the directed verdict itself, which is no prejudice at all.
 
 III.
 
 10
 Plaintiffs further contend that the district court improperly weighed the evidence in deciding the motion for directed verdict. Under our de novo review of the record, this court will affirm if it finds that "under the governing law, there can be but one reasonable conclusion as to the verdict." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); see Anderson v. Gutschenritter, 836 F.2d 346, 348 (7th Cir.1988). The evidence is construed in the light most favorable to the plaintiffs. Unless we find evidence sufficient to sustain a jury verdict in favor of the plaintiffs, we will affirm the decision of the district court. Liberty Lobby, 477 U.S. at 252, 106 S.Ct. at 2512; Lytle v. Household Mfg., Inc., 494 U.S. 545, 554, 110 S.Ct. 1331, 1338, 108 L.Ed.2d 504 (1990). While the district court may not resolve conflicts in the testimony or weigh the evidence, it may evaluate evidence at least to the extent of determining whether there is substantial evidence to support the verdict. "[A] mere scintilla of evidence will not suffice." La Montagne v. American Convenience Products, Inc., 750 F.2d 1405, 1410 (7th Cir.1984).
 
 A.
 
 11
 As a preliminary matter, it is necessary to sort out what claims plaintiffs were attempting to bring. Plaintiffs alleged discriminatory behavior by Argonne that violates section 1981 and Title VII in the denial of promotion, rehiring, and access to grievance procedures as well as in its lay-off procedure, and discriminatory retaliation and demotion. Section 1981 provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts, ... as is enjoyed by white citizens." 42 U.S.C. § 1981 (1988). In Patterson v. McLean Credit Union, the Supreme Court circumscribed the scope of section 1981 to "the enumerated rights within its express protection, specifically the right to make and enforce contracts." 491 U.S. 164, 181, 109 S.Ct. 2363, 2375, 105 L.Ed.2d 132 (1989).[2] Thus, under this narrow reading, only plaintiffs' denial of promotion, failure to rehire, and denial of access to grievance procedures are cognizable under section 1981 as well as Title VII. The lay off, retaliation, and demotion claims fall exclusively under Title VII.
 
 
 12
 For the section 1981 claims, plaintiffs alleged in their complaint that the discrimination occurred because the plaintiffs were "foreign born." Unfortunately for the plaintiffs, claims founded on that status are not cognizable under section 1981, which is designed to remedy discrimination based on race or ethnicity.[3] Certainly, the line between national origin and race or ethnicity for section 1981 claims cannot be bright. The Supreme Court acknowledged this fact implicitly in its decision in St. Francis College v. Al-Khazraji, 481 U.S. 604, 613, 107 S.Ct. 2022, 2028, 95 L.Ed.2d 582 (1987). "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics.... rather than solely on the place or nation of his origin." Of course, what is not clear from the Court's brief exposition is when the place or nation of origin, which would not be actionable under section 1981, determines ancestry or ethnic characteristics, which would be actionable. Plaintiffs' case would have been stronger had they alleged and argued discrimination based on race or ethnicity rather than national origin; however, failure to plead discrimination based on race or ethnicity for section 1981 purposes is not necessarily fatal to their cause. See, e.g., Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir.1987) (section 1981 protection extended to employee of Puerto Rican descent who alleged national origin discrimination).
 
 B.
 
 13
 While section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical. Bailey v. Northern Indiana Public Service Co., 910 F.2d 406, 410 (7th Cir.1990). A plaintiff bringing suit under section 1981 or Title VII can meet his burden of proof for establishing intentional discrimination either through direct proof of discriminatory intent, Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), or through the indirect, burden-shifting method of proof first elaborated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). While the plaintiffs may have offered evidence of racial animus on the part of supervisors at Argonne, none has offered any direct evidence of discriminatory intent on the part of Argonne. Consequently, plaintiffs must rely on the burden-shifting method of proof.
 
 
 14
 McDonnell Douglas analysis requires first that the plaintiff establish the alleged discriminatory acts. The defendant must then offer legitimate nondiscriminatory explanations for those acts. A plaintiff may then attempt to show why the defendant's stated justifications are pretextual. With respect to the failure to promote, a plaintiff must prove by a preponderance of the evidence that the plaintiff is a member of a protected group, that the plaintiff applied for and was qualified for the position sought, that the defendant rejected the plaintiff for the position, and that the defendant granted that promotion to a person whose race (or national origin under Title VII) was different from that of the plaintiff's but whose qualifications were similar or less than those of the plaintiff. Id. at 802, 93 S.Ct. at 1824; see Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981).
 
 
 15
 In an allegation of a failure to promote, a preliminary consideration is whether the positions sought by the plaintiffs constituted "an opportunity for a new and distinct relation between the employee and the employer." Patterson 491 U.S. at 185, 109 S.Ct. at 2377; McKnight v. General Motors Corp., 908 F.2d 104, 110 (7th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 1306, 113 L.Ed.2d 241 (1991). As this court has already recognized, the "new and distinct relation" standard is difficult to apply. Partee v. Metropolitan School Dist., 954 F.2d 454, 457 (7th Cir.1992); McKnight, 908 F.2d at 109-10. Application of this standard in this instance is particularly awkward because of the dual track system of appointments and assignments at Argonne.
 
 
 16
 The fact that, in each case, the plaintiffs merely assert a new and distinct relation without further analysis or the defendant claims the contrary does impede our analysis to a certain extent. The record in this regard is rather sparse. Nonetheless, among the circuits it would appear that neither an increase in pay alone, Harrison v. Associates Corp. of North America, 917 F.2d 195, 198 (5th Cir.1990), nor a simple change in status involving no additional responsibilities, Bennun v. Rutgers State Univ., 941 F.2d 154, 168-70 (3d Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 956, 117 L.Ed.2d 124 (1992), constitutes a new and distinct relation under Patterson. Therefore, at a superficial level, an Argonne scientist or engineer elevated from associate to full or full to senior does receive a higher salary, an increase in prestige, and additional responsibilities. On the record before us, however, we are not prepared to say that the change rises to the level of a "new and distinct relation." Even assuming, arguendo, that such a claim would meet the Patterson standard, plaintiffs' claims would not succeed for another reason.
 
 
 17
 Senior scientist positions are very competitive at Argonne, and the decision to promote is based on a number of considerations. Ramaswami, lacking any direct evidence of discrimination against Indians, alleges that his denial of elevation to senior status constitutes discrimination. However, the record shows that no one among the senior personnel in his division considered Ramaswami eligible for the position of senior scientist inasmuch as none of them pushed for his promotion. Thus, Ramaswami cannot succeed on this claim without something more.
 
 
 18
 Von Zuckerstein similarly relies on the indirect method of establishing discrimination, arguing that first hostility toward Central European Jews and later, in a puzzling about-face, hostility toward Germans resulted in his denial of promotion to full scientist. Other than his own assertions, Von Zuckerstein offered no evidence of discrimination. More importantly, Von Zuckerstein's failure to achieve the rank of full scientist appear to lie in his sparse publication record and his inability to work independently. As a result, none of his superiors ever presented a case for his elevation to Personnel Committee A. Finally, no evidence was presented that someone with a similar or less qualified background was promoted to the positions Von Zuckerstein sought.
 
 
 19
 Jain does not specifically allege the denial of promotion. (The refusal of Argonne to restore Jain to the post of principal investigator does not constitute a failure to promote.) In his testimony he does refer to a single instance in which he was not elevated. (Tr. 1849). However, the job position was available for a full mechanical engineer; since Jain was only an assistant mechanical engineer at that time, he did not meet the qualifications for that position. Because he did not formally pursue a promotion through Personnel Committee A, Jain cannot therefore argue discrimination in a denial of promotion as such.
 
 
 20
 Vresk does not claim a denial of promotion in the sense of not being elevated from assistant to full engineer; he was already a full mechanical engineer. Rather, he claims that he should have been placed in the Project Management Section of the PFS Division when his section was moved from EES and broken up. This promotion claim is based on a denial of a programmatic rather than an administrative promotion. To succeed such a claim must "rise[ ] to the level of an opportunity for a new and distinct relation between the employee and the employer." Patterson, 491 U.S. at 185, 109 S.Ct. at 2377. Because of the overlapping assignments on the administrative and programmatic ladders and temporary nature of many of the programmatic assignments, it would appear that the programmatic promotion allegedly denied to Vresk on racial grounds does not rise to the level of a claim actionable under section 1981.
 
 C.
 
 21
 Similar to a failure to promote claim, a failure to rehire turns on proof by a preponderance of the evidence that the plaintiff is a member of a protected group, that the plaintiff applied for and was qualified for the position sought, that the defendant rejected the plaintiff for the position, and that the defendant hired or continued to seek a person whose race (or national origin under Title VII) was different from that of the plaintiff's but whose qualifications were similar or less than those of the plaintiff. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. at 1824; see Burdine, 450 U.S. at 254, 101 S.Ct. at 1093-94. It is not enough for plaintiffs to state that they were rejected for positions at Argonne.[4] They would need to show that they were qualified for the positions sought as well as to offer evidence either that Argonne deliberately left positions open to avoid rehiring plaintiffs or that Argonne continued to seek applicants with qualifications similar to those of the plaintiffs.
 
 
 22
 None of the plaintiffs has presented sufficient evidence to maintain such a claim. Ramaswami requested transfers to three positions prior to being laid off and presented evidence of the qualifications required by Argonne for these positions--two of which sought senior engineers and the other a manager. Assuming that the denial of the request alone constitutes a prima facie case of discriminatory failure to rehire, Ramaswami failed to show that Argonne's reasons (lack of necessary qualifications for the senior positions and insufficient managerial skills) were pretextual. Von Zuckerstein did not identify any specific positions that he may have sought. This testimony alone does not allow even an assessment of whether he would have met the qualifications necessary for those positions or whether Argonne continued to solicit others for those positions. In addition, Von Zuckerstein did not challenge the testimony of another Argonne employee who testified to Von Zuckerstein's lack of qualifications for eight positions sought. Jain similarly failed to identify the specific job descriptions and qualifications for the two positions he sought after being laid off. Determinations of the qualifications for such positions require more detail to measure the particular requirements than would be evident from generic job titles.
 
 D.
 
 23
 Plaintiffs additionally contend that Argonne denied them access to a complete "equity review" in accordance with Argonne's internal grievance procedures. Under Argonne's equity review procedure, the highest official who approved the initial lay off reviews the employee's complaint as well as the lay-off package. If this person again approves the lay off, the Laboratory Director or his designate conducts a final review of the complainant's record. The equity reviews of Von Zuckerstein and Jain were pursued to their conclusions and both received letters confirming their lay offs. Although Ramaswami's internal equity review was interrupted by his filing a claim with the EEOC, he was not prejudiced because Argonne's investigation of grievances filed with the EEOC did not differ meaningfully from its own internal procedures. Ultimately, Argonne communicated the results of its review to the EEOC rather than notifying Ramaswami directly. None of the plaintiffs were prejudiced under these circumstances.
 
 IV.
 
 24
 The remainder of plaintiffs' claims--for the lay offs, retaliation, and, in the case of Jain, demotion--are cognizable only under Title VII. The district court dismissed these claims pursuant to Rule 41(b).[5] In making this determination, the court is within its prerogative "to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies." Sanders v. General Services Administration, 707 F.2d 969, 971 (7th Cir.1983). We review such a dismissal for an abuse of discretion. Id.
 
 A.
 
 25
 Plaintiffs challenge both the choices made in the course of the reduction in force, namely themselves, as well as the financial justifications for the lay offs. As far as Argonne's financial justifications go, this court is reluctant to judge Argonne's business decisions if they are made in good faith. See Aungst v. Westinghouse Electric Corp., 937 F.2d 1216, 1224 (7th Cir.1991). Certainly, the evidence presented does not indicate any lack of good faith on Argonne's part. Argonne conducted extensive reviews of candidates for lay offs subsequent to the cutbacks in funding. The fact that funding became available for other divisions or at a later date would not undermine the earlier decisions by Argonne.
 
 
 26
 With respect to the lay-off claims themselves, the court engages in the McDonnell Douglas analysis. 411 U.S. at 802, 93 S.Ct. at 1824. The first stage of this analysis requires that plaintiffs establish a prima facie case of discrimination.
 
 
 27
 In the case of a reduction of force, a prima facie case is established with a "showing that [the employee] was within the protected [class], that [the employee] was performing according to his employer's legitimate expectations, that [the employee] was terminated, and that others not in the protected class were treated more favorably."
 
 
 28
 Williams v. Williams Electronics, Inc., 856 F.2d 920, 922-23 (7th Cir.1988). It is not clear that any of the plaintiffs have even established a prima facie case of discrimination. For example, in the case of Von Zuckerstein, the only systems application economist retained after the reduction in force was foreign-born. (Tr. 657).
 
 
 29
 Assuming, as the plaintiffs apparently do, that only asserting discrimination against foreign-born employees at Argonne is sufficient, the next contention is that the reasons advanced by Argonne for the reduction in force--the reduction in funding--were pretextual. According to the procedures Argonne used, each plaintiff was laid off after his abilities as reflected in the evaluations were compared with other employees in positions for which the candidate for lay off was minimally qualified. Plaintiffs presented no evidence that the lower evaluations of these plaintiffs, or of any other foreign-born employee also laid off, were due to intentional discrimination. Consequently, the district court's reliance on the existence of multiple evaluations and a diffuse decisionmaking process to rebut any indication of pretext was not clearly erroneous.B.
 
 
 30
 The three plaintiffs also claim that Argonne retaliated against them by refusing to rehire them after they filed discrimination charges. In order to succeed on this claim, plaintiffs must establish the causal link between the filing of a discrimination claim and the refusal to rehire. See King v. Board of Regents of Univ. of Wisconsin System, 898 F.2d 533, 540 (7th Cir.1990). In other words, a plaintiff must show that the filing itself motivated the decision not to rehire. A Title VII retaliation claim also requires plaintiffs to identify positions for which they applied or to introduce evidence that they were qualified for any available positions or to show that Argonne continued to seek applicants for or filled positions with people whose qualifications were the same or less than plaintiffs. As discussed above, plaintiffs either have not identified positions to which they applied after termination or have failed to meet Argonne's qualifications for a position specifically identified. As we held in King, the denial of a position by an employer cannot be retaliatory if the applicant is not qualified for the position. 898 F.2d at 540. Thus, there is nothing in the record to suggest that the district court's decision to dismiss the retaliation claims was clearly erroneous.
 
 C.
 
 31
 Finally, Jain contends that his removal as principal investigator of the Industrial Cogeneration Project was racially motivated. Plaintiff's witness testified to a conversation in 1983 with two administrative personnel in which one of the administrators claimed that "the sponsor did not want an Indian in charge of the program." (Tr. 425). Both of those administrators deny such a statement was made. (Tr. 679, 820). Subsequent to the alleged statement, Jain was removed as principal investigator although he continued to exercise programmatic responsibilities on this project. Assuming that this conversation did take place, Jain would have established by inference the existence of a racial motivation for his removal. However, administrative supervisors from Argonne testified to other credible reasons for his removal, principally extreme delays in the project. Jain offered no reason to suggest that this explanation was pretextual. Consequently, we cannot conclude that the district court's decision to dismiss this claim was clearly erroneous.
 
 
 32
 For the foregoing reasons, the decision of the district court is AFFIRMED.
 
 
 
 [1]
 Although Rule 52(c) has since replaced Rule 41(b), this opinion shall refer to the relevant rule as 41(b)
 
 
 [2]
 The Civil Rights Act of 1991 has since overruled this portion of Patterson. See 42 U.S.C. § 1981(b) (defining broadly the right to "make and enforce contracts"). However, the Civil Rights Act of 1991 does not apply retroactively to these cases. Mozee v. American Commercial Marine Serv. Co., 963 F.2d 929 (7th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 207, 121 L.Ed.2d 148 (1992). Consequently, this case represents one of the few in which we still apply the Patterson standards
 
 
 [3]
 Title VII specifically allows for claims stemming from discrimination on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2 (1981)
 
 
 [4]
 For the remainder of the opinion, "plaintiffs" refers only to Ramaswami, Von Zuckerstein, and Jain since Vresk is still employed at Argonne
 
 
 [5]
 Plaintiffs attempt to argue that the district court granted the Rule 41(b) motion on the retaliation claims prior to the close of their case-in-chief. See Fed.R.Civ.P. 52(c) In its ruling from the bench on April 24, 1991, the district court deferred consideration of the Title VII issues. Plaintiffs had acknowledged that the only Title VII matters they wished to add were jurisdictional in nature and not about damages. (Tr. 2427). Moreover, the trial court considered post-discharge exhibits that may not have been relevant to the jury issues. Consequently, plaintiffs cannot resuscitate these claims on appeal after conceding at trial that they had effectively concluded the presentation of their case