74 F.3d 1242
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
Pastori M. BALELE, Plaintiff-Appellant,
v.
James KLAUSER, Secretary of the Department of
Administration, Gerald Whitburn, Donald L. Bach,
Jean Robers, and The Wisconsin
Department of Administration,
Defendants-Appellees.
Pastori M. BALELE,
v.
James KLAUSER, Secretary of the Department of
Administration, Nicholas Hurtgen, Leo Talsky, Jim Johnson,
Janet Abrahamsen, Ed Main, Peter Olson, Isadore Knox, Greg
Jones, Administrator, Division of Merit Recruitment and
Selection, Secretary Department of Employment Relations,
Defendants-Appellees.
Pastori M. BALELE, Plaintiff-Appellant,
v.
The DEPARTMENT OF HEALTH AND SOCIAL SERVICES, Gerald
Whitburn, Judith R. Noman-Nunnery, Jean Rogers,
Richard Lorang, and Administrator,
Recruitment and Selection,
Defendants-Appellees.
Pastori M. BALELE, Plaintiff-Appellant,
v.
Carol SKORNICKA, Robin Gates, James Klauser, Robert Lavigna,
Administrator of the Division of Merit Recruitment and
Selection, Jon Litcsher, Secretary of the Department of
Employment Relations, Department of Industry, Labor and
Human Relations, Defendants-Appellees.
 Nos. 94-1117, 94-2777, 95-1137 and 95-2948.
 United States Court of Appeals, Seventh Circuit.
 Submitted Dec. 18, 1995.
Decided Jan. 11, 1996.[1]
Rehearing Denied Feb. 8, 1996.
 
 Appeals from the United States District Court, for the Western District of Wisconsin, Nos. 92-C-841, 93-C-723 and 93-C-520; Barbara B. Crabb, Chief Judge.
 W.D.Wis.
 AFFIRMED.
 Appeal from the United States District Court, for the Western District of Wisconsin, No. 95-C-88; John C. Shabaz, Judge.
 
 ORDER
 
 1
 Pastori M. Balele, an employee of the state of Wisconsin, unsuccessfully applied for seven jobs with various Wisconsin state agencies, and the result is four lawsuits alleging discrimination on the basis of plaintiff's race and national origin. The various actions were filed under 42 U.S.C. Secs. 1981, 1983, 1985; Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. Secs. 2000e, et seq.; the First, Fifth, and Fourteenth Amendments; the Wisconsin Fair Employment Act, Secs. 111.31-111.395, Wis.Stats.; and the Wisconsin Civil Service Law, ch. 230, Wis.Stats.
 
 
 2
 In 1985, Balele, a black male of African national origin, was employed by the State of Wisconsin's Department of Administration (DOA), as a procurement management assistant in the State Bureau of Procurement.[2] After three years in that position, Balele began seeking other positions in the Wisconsin state government, but was unsuccessful.
 
 
 3
 The district court entered summary judgment for defendants in appeal Nos. 94-2777, 95-1137, and 95-2948; and in 94-1117 the district court dismissed certain claims and held a bench trial as to the remaining claims, then entering judgment in favor of defendants. These orders resulted in five separate appeals. We originally consolidated appeal Nos. 95-1723 and 95-1137, but later dismissed 95-1723.[3] As to the four remaining appeals, we now consolidate them for purposes of final disposition in this court. After a thorough review of the briefs, records, and various motions filed in this court, we affirm the judgments of the district court in appeal Nos. 94-2777, 95-1137, and 95-2948, for the reasons set forth in the decisions of the district court. As to No. 94-1117, our reasons for affirming the district court are set forth here.
 
 
 4
 Appeal No. 94-1117 involves two job applications. In September 1988, Balele unsuccessfully sought an Administrator Officer 4 (AO4) position as Bureau Director of the State Bureau of Procurement in the Division of State Administrative Services (DSAS).[4] Robin Gates, who is white, was given the AO4 job. In June 1988, Balele unsuccessfully sought an AO5 position as Deputy Administrator in the DOA Division of DSAS. Leo Talsky, who is white, was hired for the AO5 position. After the dismissal of various claims,[5] a bench trial proceeded as to the Title VII claims relating to both the AO4 and AO5 positions. We review the district court's findings for clear error. Batson v. Kentucky, 476 U.S. 79, 98 n. 21 (1986). A finding is clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed." McCluney v. Jos. Schlitz Brewing Co., 728 F.2d 924, 927 (7th Cir.1984).
 
 
 5
 Title VII makes it "an unlawful employment practice for an employer ... to fail or refuse to hire, or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race or color." 42 U.S.C. Sec. 2000e-2(a)(1). In the absence of direct evidence, and Balele offers none, he must use the indirect method established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), for proving discrimination.
 
 
 6
 First, he must establish a prima facie case of discrimination. A prima facie case is typically made out under McDonnell Douglas by showing that the plaintiff is a member of a racial minority group, that he applied for and was qualified for a job for which the employer was seeking applicants, that he was rejected, and that afterward the position remained open to others with plaintiff's qualifications. 411 U.S. at 802.
 
 
 7
 Once established, the burden of production shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action. This only shifts the burden of production; the burden of proof rests with the plaintiff throughout. St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742, 2747 (1993).
 
 
 8
 If defendant meets the burden, the presumption of discrimination raised by the prima facie case drops out of the picture, Hicks, 113 S.Ct. at 2749, and plaintiff must go on to demonstrate that the employer's proffered reason is pretextual and that the real reason for the adverse action was based on discrimination. McDonnell Douglas, 411 U.S. at 802-05. "Pretext.... means a lie, specifically a phony reason for some action." Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir.1995). The fact-finder's disbelief of the reasons announced by defendant permits the trier of fact to infer the ultimate fact of intentional discrimination. Hicks, 113 S.Ct. at 2749.
 
 
 9
 In regard to the A04 position, Gerald Whitburn (Deputy Secretary of DOA) chose Robin Gates for the position without opening the position to competition. No one other than Gates was considered for the position. When an employer does not solicit applications, a plaintiff can proceed on a discrimination claim only "if the plaintiff would realistically have been in the running for the job absent the alleged discrimination." Loyd v. Phillps Brothers, Inc., 25 F.3d 518, 522 (7th Cir.1993). Gates was then working as a budget team leader in the DOA state budget office. Whitburn testified that he believed Gates was one of the most highly-regarded employees at DOA. Also, Whitburn feared that Gates would leave DOA if Gates did not progress to a high level position at DOA because Gates had informed Whitburn that he wanted an opportunity to oversee a larger staff.
 
 
 10
 Based on this testimony, the district court was entitled to find that Whitburn made the decision to laterally transfer Gates "because he thought Mr. Gates had such outstanding qualifications." The court commented further: "State government personnel rules ... make it permissible for career executives to be given lateral transfers. That's what Mr. Gates had. It was perfectly legitimate for Mr. Whitburn to do that, unless he was doing it as a coverup for discrimination. But, there's no indication that he was doing it for that reason."
 
 
 11
 We find no clear error in the district court crediting Whitburn's testimony. Cf. Loyd, 25 F.3d at 524 (employer did not carry its burden of producing legitimate, non-discriminatory reason for its practice of preferring lateral transfer or going outside the company, bypassing other qualified people within the company). Plaintiff failed to show that defendants' proffered non-discriminatory reason for the practice of making the lateral transfer was pretextual. Cf. Daniels v. Goldin, No. 90-1533 (D.D.C. Jan. 30, 1995), 1995 WL 57467 (after a full trial, the court discredited the employer's explanations regarding laterally reassigning, as a type of preselection, and found that the employee had established discrimination; court emphasized that plaintiff was not less qualified, and in fact had more experience). Balele has failed to show that Whitburn's reason was untruthful and that discriminatory reasons played a role in motivating the actions. See Winskunas v. Birnbaum, 23 F.3d 1264, 1267-68 (7th Cir.1994).
 
 
 12
 Balele also argues that pretext was shown because Gates did not have sufficient government procurement experience. Whitburn testified, however, that he relied on Gates' other talents. There was no reason for the district court not to credit this testimony.
 
 
 13
 Balele argues further that pretext was shown because Whitburn knew Balele wanted a promotion. But Whitburn did not think of Balele as a superior candidate to Gates, even if he had considered anyone other than Gates for the position.
 
 
 14
 Next, in regard to the A05 position, an advertisement was placed announcing its availability. Because the position involved the supervision of approximately 200 employees, all applicants, including Balele, were notified that only candidates who had directly supervised 20 or more professional level employees would be interviewed. Patricia Thysse, the DOA staffing specialist for the AO5 position, believed Balele did not fit this qualification, and she screened out Balele along with seven other candidates (all of whom were white). Balele informed her that he had in fact directly managed 20 or more professional level employees, and his name was added to the interview list. In the meantime, on July 20, 1988, Balele filed a discrimination complaint with the Wisconsin Personnel Commission because he had initially been excluded from the list of candidates to be interviewed.[6] Two days later, he and the other candidates were interviewed for the position by Donald L. Bach (the administrator of DSAS) and Jean Rogers (the administrator of the DOA Division of Administrative Services).
 
 
 15
 Following the interviews, Bach and Rogers found Leo Talsky to be the most qualified, and hired him for the A05 position. Talsky had worked for 12 years in Wisconsin as the executive chief of staff in the Milwaukee County Executive's office, where he was responsible for staffing and managing the office and its seven divisions, which included supervision of the County's budget office, procurement, data processing, printing, mail service, records retention, central fleet service, mass transit, and two major airports. Talsky had previously worked as a fiscal research analyst for the Milwaukee County Board's Finance Committee for three years, and as an economist for the City of Milwaukee Mayor's office for three years.
 
 
 16
 The district court found that Balele had failed to prove that either Bach's or Rogers' decision to hire Talsky for the AO5 position was based on race, national origin, or retaliation for Balele's having filed a complaint with the Wisconsin Personnel Commission. The district court found further that Talsky was more qualified than Balele for the AO5 position; that Rogers and Bach chose Talsky because of his superior qualifications; that plaintiff failed to show that his qualifications were equal to or better than the person who was selected; and that plaintiff failed to offer direct or indirect evidence of discrimination. See Hughes v. Brown, 20 F.3d 745, 747 (7th Cir.1994) (employee's factual arguments that he was the most qualified person for the job were rejected by district court after trial; no clear error in district court's finding that it was not a pretext that the employer reasonably believed plaintiff to be less qualified). Talsky's qualifications were not similar or less than those of Balele; they far exceeded Balele's. See Kirk v. Federal Property Management Corp., 22 F.3d 135 (7th Cir.1994); Von Zuckerstein v. Argonne National Laboratory, 984 F.2d 1467, 1472-73 (7th Cir.1993).
 
 
 17
 The district court was entitled to find that the decisionmakers honestly believed that Talsky's qualifications were "considerably more impressive" than Balele's.[7] Talsky was "head and shoulders" over Balele, whose prior experience supervising employees had been in Africa and was not "comparable to running a county the size and complexity and diversity of Milwaukee County, Wisconsin." After hearing all the evidence, the district court concluded:
 
 
 18
 Mr. Bach was looking for somebody who could run the department so that he could take on bigger issues of policy and problem solving. That's a legitimate request. That's a legitimate goal for a Deputy Director of the division that Mr. Bach was heading up, and for him to choose somebody with Mr. Talsky's experience does not suggest any sort of pretext but, to the contrary, good judgment on the part of an administrator.
 
 
 19
 In addition, the district court did not clearly err in finding that Whitburn's discussing a career path with Balele before he knew Balele would not be selected for the AO5 position did not suggest bad intent or discriminatory motive, since at the time Whitburn thought Balele had not made the screening to interview for the job. Plaintiff points to nothing else that might suggest pretext.
 
 
 20
 Balele also claims that Talsky was appointed pursuant to Sec. 230.47, Wis.Stats., which allows for an interchange of governmental employees. There is no evidence that Talsky was appointed pursuant to this statute. In fact, there was an open and competitive examination.
 
 
 21
 Disparate impact was a theory plaintiff raised in two of the cases (94-1117, 95-1137), on the basis that four of the jobs sought by plaintiff were filled by Wisconsin state employees who were members of Wisconsin's career executive program. Under Wisc.Stat. Sec. 230.24, this program permits state agencies in Wisconsin to reassign an employee laterally or downward within the same agency without opening the position to competition. Plaintiff argues that the career executive program, of which he was not a member, had a disparate impact on minorities.
 
 
 22
 Disparate impact cases involve practices that are neutral on their face in the manner in which they treat different groups, but in fact they fall more harshly on one group than another. Griggs v. Duke Power Co., 401 U.S. 424, 430-31 (1971). No proof of discriminatory motive is necessary. If the practice is found to be justified by business necessity, the claim will fail. Statistics often demonstrate the disproportionate impact of the challenged practices. EEOC v. Francis W. Parker School, 41 F.3d 1073, 1076 (7th Cir.1994).
 
 
 23
 Here, plaintiff has failed to make out a prima facie case, because he has not shown how the career executive program has a disparate impact on a protected group. As to the A04 position, Balele failed to prove that the manner in which Whitburn selected Gates had a disparate impact upon blacks who might have been considered for the job. No one other than Gates was considered for the position. Under the career executive program, a lateral reassignment is permitted within DOA without notifying or considering similarly situated persons for the position. The DOA did not use the career executive program to select someone for the AO4 position. Although the career executive program was used as a vehicle to move Gates into the position without opening it to competition, only 19 eligible people were in the program, so the statistical sample size is too small to establish disparate impact.[8] See Gillespie v. State of Wisconsin, 771 F.2d 1035, 1044 (7th Cir.1985); Soria v. Ozinga Bros., Inc., 704 F.2d 990, 995 (7th Cir.1983).
 
 
 24
 Plaintiff relies on Caviale v. State of Wisconsin, 744 F.2d 1289 (7th Cir.1984), where we examined Wisconsin's career executive program, and held that the state of Wisconsin's career executive program had a disparate impact on women. We did not hold that the career executive program is unlawful per se. Significantly, we explained that the Department could "defeat Caviale's damages claim if it shows that she would not have been appointed Regional Director even absent discrimination." Caviale, 744 F.2d at 1296. As discussed above, plaintiff was not as qualified as the applicants chosen for the positions.
 
 
 25
 We agree with the district court that plaintiff failed to show that there was any indication of disparate impact with regard to the either the A04 or AO5 position.
 
 
 26
 The judgments of the district court in appeal Nos. 94-1117, 94-2777, 95-1137, 95-2948 are AFFIRMED.
 
 
 
 [1]
 After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in these cases. The notices provided that the parties could file a "Statement as to Need of Oral Argument." See Fed.R.App.P. 34(a); Cir.R. 34(f). Several appellees have filed a statement indicating that oral argument would not be necessary. Having considered the statement (none others were filed), we have concluded that the appeal will be submitted on the briefs and the records
 
 
 [2]
 Previously, Balele had worked for four years as a marketing coordinator for the Wisconsin Department of Administration; three years as an accounting supervisor for a private association in Africa; and two years as an assistant county executive in Africa
 
 
 [3]
 Plaintiff filed the notice of appeal in 95-1723 from a district court order denying his motion to stop payment of defendants' bill of costs pending resolution of the appeal in 95-1137. However, when plaintiff filed his notice of appeal, the district court had not yet determined the amount of costs. For this reason, we dismissed appeal No. 95-1723 on June 9, 1995
 
 
 [4]
 The DSAS is responsible for statewide purchasing and general service functions including records management, central mail and printing operations, fleet management, and air services
 
 
 [5]
 On June 10, 1993, the district court granted summary judgment for defendants as to certain claims, including claims under the Wisconsin Fair Employment Act and Wisconsin Civil Service Law, finding no supplemental jurisdiction because neither law permits a private right of action; the claim against the chairperson of the Personnel Commission, finding he was protected by quasi-judicial immunity; monetary claims against DOA under 42 U.S.C. Secs. 1981, 1983 and 1985, finding they were precluded by 11th Amendment immunity; a conspiracy claim under 42 U.S.C. Sec. 1985, finding that it was not sufficiently stated; claims under Title VII relating to both the AO4 and A05 positions against all defendants except DOA, James Klauser, Gerald Whitburn, Donald Bach, and Jean Rogers, finding the other defendants had not been delegated the necessary powers to make them suable under Title VII; claims under 42 U.S.C. Secs. 1981 and 1983 relating to the AO4 position against all defendants except Gerald Whitburn, because the other defendants were not involved in the decision to select Robin Gates for the position; claims under 42 U.S.C. Secs. 1981 and 1983 relating to the AO5 position against all defendants except Bach and Rogers, because the other defendants were not involved in the decision to select Leo Talsky for the position. On October 5, 1993, the district court dismissed claims against Bach and Rogers under 42 U.S.C. Secs. 1981 and 1983 relating to the AO5 position, agreeing with the Wisconsin Personnel Commission's earlier decision under the Wisconsin Fair Employment Act that Balele had not sufficiently stated a claim of discrimination with respect to the AO5 position
 
 
 [6]
 The Commission subsequently found that there was no probable cause to believe that DOA discriminated against Balele with respect to the AO5 position
 
 
 [7]
 The court explained: "[Talsky] had lots of contact with people in Washington, Milwaukee and all around the state from his former job. He had personal responsibility for managing two airports. He had responsibility and experience in managing fleets, not just of cars, but also of airplanes. He supervised a far-flung operation. He had many division heads reporting to him as Deputy County Executive in Milwaukee County and he had a huge range of responsibilities and, according to people that had worked with him, had carried those responsibilities out well."
 
 
 [8]
 Gates was one of 19 career executives then in pay range 19 and above in DOA. None of these 19 employees was a racial minority. When Gates was reassigned to the A04 position, the percentage of persons available for career executive positions generally who were minorities was no greater than 7.26%